SUPREME COURT    New York General Term, May, 1852.   *Ed-*
*wards, Mitchell* and *Roosevelt,* Justices.

JAMES SULLIVAN pl'ff in error *vs.* THE PEOPLE def'ts in error.
JOSEPH CLARK pl'ff in error *vs.* THE PEOPLE def'ts in error.

Under the Revised Statutes of New York, declaring the killing of a human
being to be murder, when done from a " premeditated design" to effect the
death of the person killed, it is erroneous to charge the jury, that the act
would be murder, if the intent to kill was formed at the instant of striking
the fatal blow.(a)

Premeditation, as well as design, is now a necessary ingredient in making out
the crime of murder, under the first clause of the section of the statute de-
fining that offence.

What are proper considerations on an application for an allowance of a writ of
error and a stay of proceedings, in a capital case, by Edmonds, J.

These cases came before the court on writs of error from the
New York Oyer and Terminer, where there had been convic-
tions for murder in both cases, Justice Edmonds presiding.
The facts are sufficiently stated in the opinion of the court, to
present the questions of law decided.   After the convictions in
the Oyer and Terminer, the counsel for the prisoners made
application to Justice Edmonds, for a stay of proceedings and
an allowance of writs of error, and on the 19th November,
1851, Justice Edmonds granted the application and delivered
the following opinion:

" Upon the bill of exceptions in these cases presented to me
this day, I am asked to allow writs of error with a stay of pro-
ceedings upon the execution of the sentences pronounced.

The question raised by the bills of exception is a grave one
It involves a construction of the revised statutes, and has never
been authoritatively adjudged by our highest courts.

It is this: whether the intention to kill, which forms an ele-
ment of the crime of murder under our revised statutes, must be
a design previously formed, or whether it is enough that it be
formed on the instant the homicide is perpetrated?

(a) Sed vide 3 Selden R. 385.

The revised statutes made very important alterations in the preexisting law of homicide.

Before their enactment, a class of cases were held to be murder where there was manifestly no design to kill; like the case of the schoolmaster, who whipped his pupil so that he died, or that of the chimney sweeper, who, in extricating his boy from a chimney, did it so cruelly as to cause his death. The law implied malice aforethought, or an intent to kill.

On the other hand, there was a class of cases, where, though there was an intent to kill, it was held not to be murder, but manslaughter— such as sudden affrays, in the heat of passion, and on sufficient provocation.

The revised statutes adopted an intention to kill, as the chief line of demarkation between murder and manslaughter, and the first class of cases I have mentioned, where there is no intention to kill, have been regarded as mitigated to manslaughter, and the last class of cases as aggravated to murder.

In the case of *The People* v. *Austin,* I held, in a carefully considered opinion, that in all cases (except one class which is not involved in these cases and was not in that), there must be an intention to kill to constitute the crime of murder, and that where there was such an intention, whether formed on the instant or previously entertained, it was murder. I so charged the juries in the cases now under consideration.

If I had any doubt upon the question, I would have reserved it for the consideration of my brethren; but I had none, because I could find in the statutes no resting place for the killing of a human being, with an intention to kill, even though on a sudden impulse, except under the definition of murder. The counsel for the prisoners, who was assigned as such by the court, and who has himself occupied a prominent position in the administration of criminal justice, entertains doubts of the correctness of my ruling, and desires to obtain the decision of the higher courts.

In order to do that now, the execution of the sentence must be stayed. I ought not to refuse it unless I am disposed to give my decisions a finality and an authority that does not

Sullivan *v.* The People.

properly belong to them. If either the Supreme Court in bank, or the Court of Appeals, should differ with me in opinion, the consequences would be irremediable.

As, then, the question involved is a very grave one, and has never yet been passed upon by either of those courts, or by any tribunal, higher than the Oyer and Terminer, and as it is raised very fairly and definitely in these cases, it seems to be one that ought to be definitely settled, and by the highest authority in the state.

The same question which was argued before the court at its last term, in the case of Carnal, is now under advisement, and will soon be determined.

These considerations have moved me to allow the writs of error, and to order the proceedings to be stayed until decision thereon."

In the first case,
*R. H. Morris,* for defendant.

*N. B. Blunt* (Dist. Att'y), for the people.

In the second case,
*John McKeon,* and
*R. H. Morris,* for defendant.

*N. B. Blunt* (Dist. Att'y), for the people.

MITCHELL, J. — In each of these cases the plaintiff in error was indicted for murder, tried, and found guilty. In each case the judge, at the Oyer and Terminer, charged the jury that, if they believed that the killing was produced by the prisoner, with an intention to kill, though that intention was formed at the instant of striking the fatal blow, it was murder. To this charge there was an exception, as well as to the other parts of the charge; and the question has been very fully and ably argued, whether an intention to kill formed at the instant of striking the fatal blow, is a premeditated design to kill,

within the meaning of the revised statutes. The revised statutes declare the killing of a human being to be murder (except in certain cases, not necessary here to notice), first, when it is perpetrated from a premeditated design to effect 'the death of the person killed, or of any human being (2 R. S. 657, sec. 5); secondly, when it is perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any such design against any particular individual; and thirdly, when it is perpetrated by one engaged in the commission of a felony, although without any design to effect death. The revisers say in their note to this section, that the great principle on which it rests is, that, to constitute murder, there should be an express design to take life (which seems to be the first case provided for), or such circumstances as to induce a very strong presumption of such design, or such facts occurring in a transaction as would ordinarily lead to the result of taking life. The two last cases, no doubt, were provided for in the second and third subdivisions. They add that this section conforms substantially to the law of Pennsylvania. They also state that there was nothing so much wanted in the criminal law as a settled line of distinction between murder and manslaughter, which were then so nearly connected, and ran into each other so much, that a lamentable uncertainty prevailed, which operated as well to screen the guilty as to expose the innocent; and that the first step to such a distinction is the definition of murder. It is evident, therefore, that it was their intention to use language which should be so clear as to remove this uncertainty, and to make it unnecessary to examine the former adjudications on the subject. For, if the former law was to be retained, and the former decisions resorted to as authority as to what the present law should be, all the old uncertainty must still remain. The same motives must have influenced the legislature, for this uncertainty was but faintly portrayed by the revisers, as any one will experience, who will attempt to reconcile the old decisions; and there was no subject which needed revision more, both on that account and on account of its vast importance. The revi-

Sullivan *v.* The People.

sers accordingly abandoned the technical phrase which was appropriated to the description of the motive of the murderer — malice aforethought — and which had, in process of time, acquired a legal meaning, different from its primitive meaning, and substituted the untechnical words, " premeditated design," that a law in which the whole state and every individual in the state may be concerned, might be understood by each, in the sense which every man, professional or not, would, on the first impression, believe it was intended to have. Does the expression " premeditated design," admit of the meaning given to it by the Oyer and Terminer? Without relying on the definitions of lexicographers, we may safely resort to the illustrations which they have given of the use of words. None of them give a single illustration of the word to meditate in which the idea of a considerable space of time is not contained as intervening during the operation of the mind. The word meditate comes to us from the Latin, and perhaps through the French. Ainsworth has collected instances of its use in those Latin authors whose works form the foundation of our education. They are, to forecast; to meditate or study how to plead a cause, or how to speak; meditate going into exile, or a flight, or snares or deceit against another, or punishment against a brother, or an armed expedition into India. The illustrations in the dictionary of the French Academy are — to meditate a truth; an idea; rules of eloquence; an enterprise; a project; the ruin of another; a good or bad action; or to retreat from the world; and they say proverbially, " a man of ready wit comes sometimes to as happy results as if he had meditated," making a complete contrast between meditation and the hasty thought which in the same instant is followed by action. Their definition of meditation makes the contrast still greater. It is " an operation of the mind, which applies itself to reach the depths of any subject or matter." The mind which seeks to reach the depths of any subject that is worthy of reflection, must be long occupied before its wishes can be gratified. Can one be said to meditate the banishment of another, or snares, or deceit, or the punishment of another, or his own flight, or

the invasion of a foreign country, if he does not allow a consi-
derable interval to elapse between the first formation of the
design and its execution? Cæsar said of one of his conquests,
*veni, vidi, vici;* and all understand it as a proud boast, that as
soon as he reached and saw the enemy's country he conquered
it. How completely would he have reversed this meaning if
he had said — " On my arrival I meditated on my design, and
accomplished it." The admission that he had meditated
would have showed that there were difficulties which delayed
him and required some management before they could be
accomplished. So, to turn to the French illustration, can one
be said to have meditated on an idea, on an enterprise, a pro-
ject, the ruin of another, or a good or bad action, who per-
formed the action at the very moment the thought was formed?
So, when " meditations on death" are spoken of, do men mean
the thoughts of a moment, or the calm, deliberate reflections
which may have exercised the mind for hours or years, or even
the most of one's life? The only illustrations given by Webster,
correspond with these   One is from Washington, who says,
" I meditate to pass the remainder of my life in a state of
undisturbed repose;" and the other from the book which is in
every body's hands or hearing, and is one of the best sources
of pure English — " His delight is in the law of the Lord, and
in his law doth he meditate day and night." (*Psalm* I.) These
quotations show the general and popular understanding of the
word, and that is the legislative understanding, where technical
words are not used, or words relating to a trade or art   But
here the legislature has used a still stronger word, viz.: " pre-
meditated design." There must be, therefore, not only the
design to kill, but that design must have been the subject of
meditation, or reflection before, as the prefix *pre* clearly re-
quires. Before what is this premeditated design of killing to be,
except before the act that was meditated, viz., the fatal blow by
which the killing was accomplished. The very requirement
that the design shall be thought of and meditated before the
act shall be committed which is the cause of death, admits
that there is an interval between the design or intention and

the commission of the act. We have no right to strike out so material a part of the word as this, which gives peculiar force to the ordinary meaning of the rest of the word. This interpretation of the word also corresponds with the expressed views of the revisers, which seem to have been to confine this part of the definition of murder to what was frequently called cases of express malice, which is thus defined by Blackstone: — " Express malice is, when one with a sedate, deliberate mind and formed design, doth kill another, which formed design is evidenced by external circumstances, discovering that inward intention, as laying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." (4 *Bl. Com.* 199.) These external circumstances are all of a nature which show a design formed before the moment when the crime was perpetrated; and the sedate, deliberate mind and formed design are descriptive only of a mind deliberating on and then sedately carrying out its design. In Tennessee, the term premeditated is one of those used to define murder in the first degree, and in 10 *Yerger*, 551, *Dale's case*, the court said premeditation was a " design to kill, formed before the act." In *Davis's case* (2 *Hamphrey*, 439, 442), they say that the employment of a deadly weapon, although it implies malice at the common law, does not imply that the act was done with premeditation, so as to make it murder in the first degree. In Virginia, in *Jones's case* (2 *Leigh's Va. Rep.* 598, *p.* 611), the court say that the death must be the ultimate result, which the concurring will, deliberation, and premeditation of the party accused sought. In an early case in Pennsylvania (4 *Dallas*, 145, *Mulatto Bob*), the court instructed the jury that the offence was willful, deliberate, and premeditated (this would seem to have been a clear usurpation of the province of the jury), the judge then admitted that the statute made premeditation an essential ingredient to constitute the crime, yet added that still the intention remains as much as ever the true criterion of the crime. This, in some sense, is true. The intention is one of the true criteria of the crime; but, as the judge admitted, and every one else must admit, it is not the

only true criterion, for then the intention to kill being estab-
lished, the jury are to inquire no further, and all intentional
killing is murder, though committed in self defence or against
a burglar in the act of breaking into one's dwelling house, or
in the heat of passion in a combat provoked by the deceased,
without any undue advantage being taken, or any dangerous
weapon being used, and under the honest, though erroneous
belief. that it was the only means of saving the life of the
accused.   In Ohio (12 *Ohio Rep.*, 52), *Shoemaker's case*, the
court held that if the accused premeditated the fatal act, he
was guilty of murder in the first degree, " however short the
time might have been between the purpose and its execution;"
that it mattered not how short the time, if the party had turned
it over in his mind, weighed, and deliberated upon it; but it
was conceded that the offence was not committed when the
design was so hastily formed or premeditated and executed that
time did not intervene for deliberation.   In 2 *Tenn. Rep.* 8,
*Anderson's case*, the court say: — " The law knows of no spe-
cific term within which an intent to kill must be formed so as
to make it murder.   If the will accompany the act a moment
antecedent to the act itself which causes death, it seems to be
as completely sufficient to make the offence murder, as if it
were a day, or any other time."   Whether the rule thus laid
down is not too harsh to be consistent with the term premedi-
tated, is not now before the court; but the principle is clearly
admitted by it that some period must intervene between the
intent and the act.   In our own state, in *The People* v. *Enoch* (13
*Wend.* 159), the meaning of the first subdivision of this section
of our revised statutes was incidentally passed upon, and Chief
Justice Nelson considered it as confined to express malice, or
" malice aforethought, according to its sense in common par-
lance, and as originally used."   (*Id. p.* 164.)   The chancellor
also said that " the meaning of the term malice aforethought
had been enlarged so as to include implied malice by judicial
construction.   (*P.* 164.)   In *White's case*, senators Furman,
Verplanck, and Wager, concurred in the view that the words
premeditated ,, design," as used by the statute, limit the signi-

fication of malice aforethought to express malice. (24 *Wend.* 558, 569, 581.) There are some cases at Oyer and Terminer, in which the rule adopted in the court below was laid down; in one the party was acquitted, perhaps on account of the jury seeing no alternative between an absolute acquittal and the punishment less than death, which the party may have deserved. But the rule has never, it is believed, received the sanction of the court after an argument at a general term or in bench. It does not correspond with the spirit of the day, actuating not classes only, but all parties, which is that the penalties of the law should be mitigated; and that by this means the object of the law in securing a certainty of conviction where guilt is proved, may be more effectually accomplished. It was argued that the words used by the judge in his charge were " intention (not design) to kill formed at the instant of striking the blow;" and that intention always implied, and was the result of premeditation. The court below would be unwilling to adopt this argument, or to allow a jury to be as much misled as they would have been by this charge, if such a meaning were intended. That court have themselves defined the word by their own use of it. They speak of the intention, and say it is enough, " though formed at the instant of striking the fatal blow." The intention, therefore, that they spoke of was such as could be formed " at the instant," and needed no premeditation. This part of the charge was material to the case; and although in the case of Clark there are circumstances from which the question may be raised whether it ought not to be left to a jury to say whether he was not guilty under the second subdivision of the section, still, that was a matter not left to them, and which this court ought not to take from them, so far as the intent of the accused is concerned, and probably in other respects, and is a question which the court do not wish to pass upon. A new trial should be granted before the court of Oyer and Terminer in both cases.

In the case of Clark, the following opinion was pronounced by ROOSEVELT, J. The prisoner, Joseph Clark, was convicted

at a court of Oyer and Terminer, held in September last, of the crime of murder, and sentenced to be executed in November following. A stay of proceedings having been obtained for the purpose, his case is now brought before the supreme court for review on certain points of law raised at the trial, and which his counsel insist were erroneously decided against him. It appears from the bill of exceptions which it should be borne in mind does not bring up all the facts, that some time in July last, about an hour after midnight, some seven or eight persons, including the prisoner and one John D. Brown, were together in Oliver street; that there were a great noise and indications of a fight between two sailors, one having taken off his coat, that two police officers, Sullivan and the deceased, hearing the noise, came up and requested the persons to disperse, which they did, leaving Brown and the prisoner, however, whose lodgings were immediately opposite to the scene of disturbance, remaining; these two also were then requested by the officers to go home, which it is contended they were not bound to do. They did not refuse; but Brown hesitating, deceased took hold of him gently by the arm, to lead him to his boarding house— an act for which it is also contended the policeman had no authority. At all events, Brown resented it, and clenched the deceased, when Sullivan interfered and separated them. After going a few steps further, another clenching and separation took place. Deceased continued to urge Brown along, and at length got him, according to the testimony, as far as the alley way to the house in which he boarded, when a third clenching took place, Brown trying to throw the deceased. Sullivan again interfered, and in the scuffle struck Brown with his club. The prisoner now procured a cart rung, and came to the defence of his friend, striking the deceased a violent blow on the head, and repeating the blows three times after he had fallen. He then went into his lodgings. Deceased was removed to the hospital, where he died the same night. The conduct of the deceased policeman, it is in testimony, was mild and forbearing, and there is no conceivable motive for prisoner's assault upon him, unless it be the one intimated by him immediately after

reaching his lodgings — that " seeing two officers beating a
sailor, he knocked one of them down." On the trial the de-
fence rested mainly on two points: first, that there was no
premeditation; and secondly, that the act, although unjustifia-
bly severe, was defensive; and that, in either view, the case
was one of manslaughter, and not murder. The court, among
other things, charged the jury that, under the evidence in the
cause, there was no sufficient excuse shown for the violent
interference of the prisoner; that the mere fact of Brown and
the policeman Sullivan being engaged in the alleged quarrel,
shown by the evidence, was not sufficient to justify the assaults
upon Gillespie; and that, so far as deceased was concerned, it
did not appear that he had given offence to any one. The
court further charged, that if the jury believed that the killing
was produced by the prisoner, with an intention to kill, though
that intention was formed at the instant of striking the fatal
blow, it was murder; and that the jury might infer such inten-
tion from the circumstance of the case, and among other things,
from the nature of the weapon, and the wounds given by it.
The first part of this charge, upon a more deliberate review,
can hardly be said to do full justice to the position of the parties.
It assumes that Brown and the policeman, Sullivan, were alone
engaged in the quarrel; whereas the proof shows that the de-
ceased, from the kindest motives, no doubt, was the first to lay
hands upon Brown, gently, it is true, but still, as the resent-
ment of the latter shows, offensively. Sullivan and the deceased
clearly co-operated; and although Sullivan alone used the club,
both in judgment of law, were responsible for that act, lawful
or unlawful. Had death ensued to Brown, both must have
been tried for the homicide; and on such trial, both must have
been required to prove that they were engaged in the discharge
of a legal duty, and that the act, however deplorable, was
necessarily committed, in overcoming actual resistance. Was
it, then, the legal duty of the policemen, after the gathering had
dispersed and quiet was restored, to compel, by force, the two
remaining persons, standing on the sidewalk, in front of their'
own homes, to go in, whether willing or unwilling ? If it was

not what must have been the result of such trial ? A verdict of manslaughter, in one or other of the four degrees would seem to have been very probable. Brown, however, although thus assaulted and with a dangerous weapon, in point of fact, was not killed but only severely wounded. But did the circumstances furnish no excuse for interference in his favor? Had it been the case of a wife, parent, child, master, mistress, or servant, and there had been reasonable ground to apprehend imminent danger of some great personal injury, the law would have justified interference, even to the point of killing. Although Brown stood in neither of these relations to the prisoner, and may have been, as far as we know, a mere stranger, yet the spirit of the law in some degree at least may be certainly invoked to mitigate what otherwise would seem to be not only an atrocious, but utterly motiveless and inexplicable deed. Next, as to the prisoner's intention to kill — this clearly could not be inferred from the nature of the weapon alone, unless we go back, and apply the same rule to the use of the club by Sullivan upon the head of Brown. The club and the rung were alike dangerous weapons. Death might result from the use of either. But the prisoner, it is said, after an interval repeated his blows; and so did Sullivan. Admitting, however, that there was no palliation — that there was an actual intention to kill — but that such intention was only formed at the instant of striking the fatal blow — was the act manslaughter, calling for incarceration in the state prison, or was it murder, to be expiated only on the gallows? The law says that killing without authority, when perpetrated from a premeditated design to effect the death of the person killed, or of any human being is murder. Is then an intention formed on the instant a premeditated design? Consulting merely the popular acceptation of language, or even the dictionaries in general use, we must certainly answer that it is not. So far from being synonymous, these two forms of expression are generally employed to convey directly opposite ideas. All *extempore* discourse is understood to be the antipode of a premeditated one. The words premditate and design both import forethought, careful

Sullivan v. The People.

reflection, deliberately arranged purpose—ideas all involving, in their structure, the essential element of time. We may not perhaps be able in every, or in any case, to define the precise number of hours or days; but still there must be time, reasonable time—time for reflection—time to survey the contemplated deed in all its bearings and probable results; and to contrive and arrange, if so decided, the means and method and occasion of its deadly accomplishment. How, then, can it be said, without shocking all our notions of speech, whether common or cultivated, that an intention to kill, formed on the instant of striking the fatal blow, is the same as a premeditated design to commit the crime of murder? The present law of homicide, it must be remembered, is, in this state, a written and a recent code. It was composed by men selected to give utterance to the more humane spirit of the age, and in language adapted, or at least intended to be adapted to the present understanding of those whose conduct it was to regulate. This consideration, therefore, must furnish the rule for its interpretation, and with such rule, or even without it, it seems impossible to believe that the legislature, in treating the subject of homicide, and measuring its criminality and punishment, intended to place sudden impulse upon the same footing as deliberate malice. To do so, instead of softening, would have been to aggravate the harsh features of the common law, and to violate the almost universal sentiment of the community. But, says the district attorney, if the crime of the prisoner (and a great crime it is admitted to be) is not adjudged to be murder, the criminal, contrary to all just notions of the adaptation of punishment, will escape with the comparatively slight penalty assigned to manslaughter in the fourth degree, not exceeding two years' confinement in the state prison. If this result were to follow as a necessary consequence of a reversal of the judgment of the court below, it would afford no reason for hanging the offender. It would merely show that in framing a system of written law, an oversight not very uncommon in such cases had occurred, to be remedied, not by the judiciary, but by the legislature. If, however, the meaning above ascribed to the word " design," as

used in the statute, be the true one — if it imply forethought, contrivance, laying in wait, deliberate purpose — then there is no difficulty, should the case call for such a verdict, in bringing it under the head of manslaughter in the first or second degree, and applying to the crime such punishment, extending even to imprisonment for life, as may be justly adapted to whatever circumstances of aggravation may have attended its commission. My conclusion, therefore, is that the verdict should be set aside and a new trial ordered.

EDWARDS, J., concurred.

Judgment reversed and new trial awarded.

---

SUPREME COURT.    New York General Term, December, 1852.
*Edwards, Mitchell* and *Roosevelt,* Justices.