M. C. COOK, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

1. The defendant propounded the following question to a witness: "While you and Brooks and Cook were on the railroad track, what remark did Cook make in regard to protecting our citizens?" This was objected to by the State Attorney, and the objection sustained, but the court stated the witness could be asked what was said in the conversation; and defendant's attorney then asked the witness to state the whole conversation, which the witness proceeded to do. Even if the question was permissible, the court committed no reversible error.

2. When the defense is that the defendant was so much intoxicated as to be unable to premeditate the killing, and a conversation with him is brought out by his attorney from his own witness as to his condition while walking on a railroad track at night, a short time before the killing, and also a statement that he staggered, the witness may be asked on cross-examination what was the condition of the track, whether any man was not likely to make a misstep, and whether persons other than the defendant stumble there sometimes.

3. Where a witness produced by a party to prove his good reputation testifies that he knows such reputation, and that it is good, he may be asked on cross-examination, for the purpose of testing his credibility, if he had not heard that the party had

been guilty of specific acts of bad conduct pertinent to such general reputation; but the witness can not be interrrogated as to his knowledge of such specific acts, nor can his testimony as to what he may have heard respecting specific acts be considered for any other purpose than as affecting his credibility.

4. Where a defendant in a prosecution for murder puts his reputation and general character in evidence, and does not limit the evidence to testimony as to his being a quiet and peaceable man, the State on cross-examination, over the objection of defendant, asked the witness testifying to general good character, if he had not heard that the defendant had, previously to the commission of the alleged crime for which he was then being tried, been guilty of specific acts of bad conduct, affecting his general character. This was not erroneous. The cross-examination of a witness may be as broad as his testimony in chief.

5. When a defendant in a prosecution for murder has put his general character or reputation in evidence, it is competent for the State, in rebuttal to interrogate its own witness as to the general reputation of the defendant as a peaceable and law abiding citizen, and as to whether that character is good or bad. Upon the witness answering that the defendant was peaceable and law abiding except when he was drinking, and there being testimony that defendant was drinking when the homicide occurred, it is competent for the State to ask the witness whether the defendant's reputation when drinking was peaceable and law abiding, but it is not competent to ask the witness about how often the defendant was drinking.

6. When a motion to strike the testimony of a witness is made, and a part of the testimony which is covered by the motion is competent, there is no error in overruling the motion.

7. In a trial for murder in the first degree, where there is any testimony which warrants it, the following instruction asked for by the defendant should be given, viz: "It is a general principle of law that intoxication is no excuse for crime, but this general principle has this important qualification or modification, so far as it relates to murder in the first degree: A particular or specific intent is absolutely essential in the commission of this crime, and if the mind of the person doing the killing is unable, because of intoxication, at the time of the killing, to form this particular or specific intent, there can be no murder in the first

degree, unless the person doing the killing became voluntarily intoxicated for the purpose of killing while intoxicated."

8. In a trial for murder where the defense is that defendant was so much intoxicated as to be unable to form a premeditated de= sign to kill, the following instruction, when requested, should be given, viz: There may, in contemplation of law, be an intention to kill a human being, which may not amount to a premeditated design to kill. Shooting a man intentionally and killing him is not necessarily the same as doing so with a premeditated design to kill. There may be an intention to kill without its having been premeditated. In order to convict the defendant of murder in the first degree, you must be satisfied from the evidence beyond a reasonable doubt, that the defendant, not only 'had an intention to kill the deceased, but that he actually had a premeditated design to kill him.

9. In a trial for murder in the first degree, the following instruction embraces a correct proposition of law, viz: "The law presumes a sober man to intend what he does, but the law does not presume a killing with a premeditated design. This, like every other element of murder in the first degree, is to be inferred by the jury from the facts proved beyond a reasonable doubt."

10. When the judge in his general charge has correctly given the law of reasonable doubt as recognized· in this State, it is not error to refuse to give instructions defining such a doubt in other language and forms of statement of the law.

11. When the judge has given in his charge the correct definition of reasonable doubt, it is not error to refuse to instruct the jury: "If there is from the evidence a possibility of the innocence of the defendant he is entitled to an acquittal."

12. It is not erroneous to refuse the following instruction: "Before the jury can convict the defendant, the evidence must be so strong as to convince each juror of his guilt beyond a reasonable doubt; and if, after considering all the evidence, a single juror has a reasonable doubt as to the defendant's guilt, arising out of any part of the evidence, then the jury can not convict him."

13. A trial judge is not required to give an instruction defining murder in the third degree when there is no evidence in the case to which such an instruction would be applicable.

14. There is no error in refusing an instruction giving the law as contained in section 2924, Revised Statutes, 1892, when the judge

in his general charge, has given the substance of the section to the jury.

15. In view of the testimony in this case, an instruction that "the jury should not convict from prejudice or upon insufficient evidence" should have been given.

16. Where a trial judge in his charge, undertakes to give the statutory definition of murder in any degree, or manslaughter, it is erroneous to substitute other words and phrases in the place of those used in the statute, or to ,interpolate other words, which substituted or interpolated words and phrases change the meaning of the statutory definition.

17. Where the trial judge, in his charge, omits to confine the venue to the county in which the crime is alleged in the indictment to have been committed, such omission would only be erroneous where there was a question as to the proof of venue.

18. In a trial for murder in the first degree, the trial judge used in the conclusion of a charge the following language, viz: "And when he fired the shot, he intended to kill Smith, or any particular human being, it would be murder in the first degree." In the opinion of Chief-Justice TAYLOR and Justices SHACKLEFORD and HOCKER, this language is erroneous and misleading in a definition of murder in the first degree. CARTER, P. J., and Justices MAXWELL and COCKRELL have a contrary opinion. So the question presented by this charge is not decided.

19. In a trial for murder in the first degree, the trial judge gave the following charge: "No specific time is required to constitute premeditation. If the mind of the accused was in a condition to form a purpose, and there was a sufficient time for the forming of that purpose, and for the mind to be conscious of that purpose to kill, it is sufficient time to constitute premeditation, and if the jury believe from the evidence, beyond a reasonable doubt, that the defendant had fully formed a purpose to shoot and kill Smith, and that he was conscious of that purpose when he fired the shot, they will find the defendant guilty of murder in the first degree." In the opinion of Chief Justice TAYLOR and Justices SHACKLEFORD and HOCKER, this charge, taken as a whole, does not afford a proper definition of premeditated design, and was erroneous. Contra, CARTER, P. J., and Justices MAXWELL and COCKRELL. The court being equally divided in opinion, the question presented by this charge is not decided.

20. In a charge to the jury in a criminal case, no fact essential to constitute the crime should be assumed to be true, unless that fact is clearly admitted by the defendant.

21. A charge to the jury in a criminal case in the following language is erroneous, *viz*: "If the jury in this case have a doubt in their minds arising from the evidence, or lack of evidence as to all the material allegations of the indictment, they will give the defendant the benefit of such doubt, and find him guilty of such degree of crime as they believe from the evidence, beyond a reasonable doubt, him to be guilty of, and if guilty of no crime, then acquit." If the jury had a reasonable doubt arising from the evidence, or lack of evidence as to *all* the material allegations of ·the indictment, they would not be *authorized* to convict the defendant of any degree of crime.

This case was decided by Division A.

Writ of error to the Circuit Court for Brevard county.

The facts in the case are stated in the opinion of the court.

*C. C. Chillingworth* for plaintiff in error.

*J. B. Whitfield,* Attorney-General, for the State.

HOCKER, J.—The plaintiff in error, M. C. Cook, was jointly indicted with J. C. Murray and Floyd Walton at the fall term, 1902, of the Circuit Court of Brevard county, for the murder of one Stephen Smith, alleged to have been committed on the thirtieth day of August, 1902, and said defendants were tried at that term. Murray and Walton were acquitted, and Cook was convicted of murder in the first degree, without recommendation, and sentence of death was passed upon him. From this sentence and judgment a writ of error was taken from this court.

There are eighty-one assignments of error.

The second assignment of error is: "The court erred in sustaining the State's objection to the following question

Cook v. State.—Opinion of Court.

asked M. L. Tarver: 'While you and Brooks and Cook were on the railroad track, what remark did Cook make in regard to protecting our citizens?'" The record shows that the court sustained the objection of the State Attorney that the question was leading, but stated that the witness could be asked what was said in the conversation alluded to; and was asked by the defendant's attorney to state the whole conversation, which the witness proceeded to do, so far as he heard it. He was then asked if he had stated all that Cook said, and especially whether he said, "We must protect our citizens," and the witness replied, "No, sir; if he did, I did not hear it." Even if the questions were permissible the assignment presents no error.

Third assignment: "The court erred in overruling defendant's objection to the following question asked M. L. Tarver: 'But other men stumble there sometimes, don't they?'" Tarver, who was the defendant's witness, had testified that he and Cook had been together on the railroad track at night a short while before Smith was killed, and was examined at considerable length by defendant's counsel in regard to what persons he had met and spoken to, conversations with several, whether Cook had been drinking, and what was his condition as he was walking up the track. On cross-examination he was asked if Cook was sober. He had testified that he seemed to 'be in his usual condition and could get along all right, with the exception of staggering, and that he did not stagger very much. He was then asked what was the condition of the track, and whether any man was not likely to make a misstep, to which last question he answered, "I guess so." He was then asked the question objected to and answered: "I never seen any one stagger along there as he did that night." As the contention was made by Cook's attorneys in the trial of the case that he was intoxicated and unable to premeditate the killing, we do not perceive how he was damaged by the question or

answer.   Moreover, it seems to have been a proper question on cross-examination.

Fifteen assignments of error—from the fourth to the eighteenth, inclusive—are grouped in the briefs and presented together.   We will consider such of them as, in our opinion, present distinct questions.

The fifth assignment is: "The court .erred in over-ruling defendant's objection to the following question: 'Did you hear of his having a difficulty in Frank's store?' "

W. J. Allen was called as the defendant's witness and examined as to Cook's reputation and general character in the community in which he lived, and had been asked by defendant's attorney whether that reputation was good or bad.   The witness answered that, with some reservations, it was good.   He was then asked, "What do you mean by reservations?"   He answered, "Cook's character was good except as to his habits—his drinking habits."   On cross-examination by the State Attorney, he propounded the question presented in this assignment.

It is contended that evidence of good character must be confined to general reputation, and that evidence in rebuttal must also be confined to general reputation; and the rule laid down in *Reddick v. State*, 25 Fla. 112, 433, 5 South. Rep. 704, is relied on to sustain this and other similar assignments of error.   In this case (*Reddick v. State*) the defendant had introduced evidence tending to show his good character; and the State, in rebuttal, introduced as a witness one John Ligon, who testified that two years before he was deputy sheriff of Brooks county, Georgia, and had a warrant for the arrest of Reddick, in which he was charged with assault with intent to murder, and that he had chased Reddick into Madison county, and then lost track of him.   This testimony was objected to, and forms the basis of the ruling in that case, which is as follows: "In all cases where a man is on trial accused of crime he has the right to introduce evidence to show his general good

character or reputation, but the evidence is to be confined to general reputation, and particular acts of good character cannot be shown in evidence; and the same rule applies to the prosecution. The prosecution cannot put in issue the character of the accused, but when the accused himself puts his character in issue, the State has the right to introduce evidence in rebuttal to show that the general character of the accused is base; but the evidence so introduced by the State, or evidence brought out on cross-examination by the State, must be confined to the general character of the accused, and if particular acts of bad conduct on the part of the accused are allowed in proof, such proof is illegal, and cause for reversal." We have no doubt that proof in such a case by the State in rebuttal of good character should be confined to general reputation, and that specific acts or conduct on particular occasions is improper. *Nelson v. State,* 32 Fla. 244, 13 South. Rep. 361. The court properly applied this doctrine in the *Reddick* case, and it was not called upon to say what questions the State Attorney could or could not ask in cross-examining a witness who had testified to the good character of the accused, as such a question was not before the court. If the rule in the *Reddick* case is to be understood as holding that, on cross-examination of a defendant's witness who has testified to the good character or reputation of the defendant, the State is confined to questions in relation to the general reputation or character of the accused, then we think the State's rights are narrowed beyond reason or authority. In *Regina v. Wood,* 5 Jur. 225, a witness was called, and testified to the good character of Wood, one of the accused. On cross-examination by the prosecution he stated that he had never heard anything against the accused. He was questioned as to whether he ever heard of a robbery which had taken place in the neighborhood some years previous. On his answering in the affirmative, he was asked, "Did you ever hear that W. was suspected of having done it?" This

was objected to. Baron Parke, in passing on the objection, stated: "The question is not whether the prisoner is guilty of that robbery, but whether he was suspected of having been implicated in it. A man's character is made up of a number of small circumstances, of which his being suspected of misconduct is one. The question may be put." The doctrine is discussed in Underhill on Criminal Evidence, section 82, in the following terms: "Evidence of specific acts of bad conduct is not admissible to show bad character. The accused may always be prepared to meet an attack on his general character, but cannot fairly be required, without notice, to controvert particular *facts*. But a witness to good character may be asked on cross-examination whether he has heard rumors or particular and specific charges of the commission of acts inconsistent with the character which he was called to prove, and generally as to the grounds of his evidence, not so much to establish the truth of such facts or charges as to test his credibility and to determine the weight of his evidence. He may be asked if he has not heard some general report which contradicts the good reputation which he has been called to prove. If he admits having heard derogatory reports of the accused, the latter may show their nature and subject-matter to prove that they did not relate to and do not affect the particular trait of character in issue." The subsequent sections of this work continue a profitable discussion of the subject. In 3 Rice on Evidence (Criminal), section 376, it is said: "While particular acts of bad conduct are not admissible to assail character on the direct examination, a witness deposing to general character may be cross-examined as to the particular facts, in order to test the soundness of his opinion, and elicit the data on which it was founded. *Jackson v. State,* 78 Ala. 471; *Steele v. State,* 83 Ala. 20, 3 South. Rep. 547. The same is said generally by the text writers on the laws of evidence. 1 Taylor Ev., sec. 352; 2 Starkie Ev. 304. By this is meant not the truth of such particular

facts, but circulating rumors of them, which form a·part of the general repute and help to make up one's good or bad character." *State v. McDonald,* 57 Kan. 537, 46 Pac. Rep. 966; *State v. Merriman,* 34 S. C. 16, text 38, 12 S. E. Rep. 619; *State v. Pain,* 48 La. Ann. 311, 19 South. Rep. 138; *Ozburn v. State,* 87 Ga. 173, 13 S. E. Rep. 247; *White v. State* (Ala.), 21 South. Rep. 330; *Goodwin v. State* (Ala.), 15 South. Rep. 571. Some of the questions on cross-examination of this witness, objected to and assigned as error, are very broad indeed; for instance, "Did you ever hear of his keeping a blind tiger?" Undoubtedly this question would have been improper if the defendant had not unnecessarily attempted to prove by the witness his general character. If he had limited his proof by this witness to the reputation of Cook as a peaceable and quiet man, as is the proper course, the question would have been too broad, and would have been erroneous; but as the defendant had, in the examination in chief, opened up the subject of his general character, no reason is perceived why the cross-examination might not include matters affecting that general character. In other words, the State may cross-examine a defendant's witness upon those matters which are in the scope of the testimony of the witness in his chief examination. *Siberry v. State,* 133 Ind. 677, 33 N. E. Rep. 681; *State of Iowa v. Arnold,* 12 Iowa 479.

The State introduced as a witness one B. F. Hull, and the State Attorney questioned the witness as to his knowledge of Cook, and then propounded the following questions and elicited the following answers:

*Q.* "Do you know what his reputation is for being a peaceable, law-abiding citizen?" *A.* "Well, I have had some observation as to it." *Q.* "Do you know what that reputation is?" *A.* "I have heard something of it; yes, sir." *Q.* "Was his reputation for being a peaceable, law-abiding citizen good or bad?" *A.* "Well, sir, he is a very peaceable,

law-abiding citizen except when he is. drinking, except when he has been drinking—with that exception."

There was no objection interposed to the foregoing questions or answers. Then the following questions and answers followed:

Q. "About how often was that?" A. "The darkies said that on Saturday night, as a general thing, he would get on a little drinking spree. I don't know what to say as to just how often." Q. "When he was in this condition, was he law-abiding and peaceful, or quarrelsome, as a matter of reputation. What did people say about him?" A. "I didn't find him especially so. That was what people said about him." Q. "What did people say about his being quarrelsome?" A. "When he was drinking? Well, I have heard it said to a certain extent; I can't say how much." Q. "That he was quarrelsome?" A. "Not especially so, but that he was when he was drinking; yes, sir."

Each of these questions was objected to on the ground that "it is improper to ask in regard to alleged specific acts of misconduct," but the objections were overruled. Exceptions were noted to these rulings, and they are assigned as error here.

We think the questions propounded were all proper, as against the specific objection made, except the one, "About how often was that?" which evidently required the witness to testify how often the defendant was drinking, or, in other words, to testify to specific acts in respect to drinking. This was not a proper subject of inquiry, and the court below should have excluded the question. The other questions were proper, and no error was committed in permitting them, under the facts of this case. We fail to see why, if the homicide was committed by the defendant while drinking, which the evidence shows was the case here, and he introduced testimony as to his good reputation for peace and quietness, the State may not rebut that testimony by proof showing that his reputation was that of a dangerous and

Cook v. State.—Opinion of Court.

violent man when drinking. It is a well known fact that some men are violent and dangerous when drinking, while quiet and peaceable when sober; and if a man has established such a reputation, it is but fair to permit proof of it when, as is the case here, the party is shown to have been drinking when he committed the act. Such testimony does not relate to a course of conduct, nor to specific acts of bad conduct, but to the general reputation of the party. See *State v. Hunter,* 118 Iowa 686, 92 N. W. Rep. 872. It is true that the proof must be confined to the general reputation of the party, but if his reputation be that of a peaceable and quiet man when sober, and of a violent and dangerous one when drinking, then to exclude proof of the latter will result either in excluding all proof on the subject, or in admitting proof of his reputation when sober only, which would itself be a violation of the rule requiring proof of *general* reputation to be given. Again, if the reputation be not the same when sober, then, in order to convey a correct impression as to whether the reputation be good or bad, the witness must be permitted to state the facts, *viz*: that the reputation when sober is good, when drinking, bad.

The State Attorney introduced as a witness one R. R. Ricou, and propounded the following questions and elicited the following answers, the witness having stated that he had known Cook about seven years:

*Q.* "Do you know what his reputation is for being a peaceable, law-abiding citizen? What do the people say of him?" *A.* "I don't know what his reputation is myself, only from what I hear of him." *Q.* "Do you know what the people there say of him?" *A.* "Yes; I have heard the people there say that he paid his bills, and that as a working negro he was very good, but that he was given to drinking; that he was very ugly when he was drinking, and that he got drunk quite often." *Q.* "Then he got drunk quite often?" *A.* "Yes, sir; that's about all I know."

The defendant's counsel then moved to strike the last two answers of the witness on the ground that it is incompetent for the witness to testify as to alleged specific acts of misconduct or particular traits of character on the part of defendant Cook, and on the further ground that it is only competent, in answer to the questions put, for the witness to state generally as to what he has heard, and to state the sources of that information from personal residence in the neighborhood, from persons long in the neighborhood of the defendant, and who were, therefore, competent to know. These objections were overruled, and the ruling assigned as error.

If any part of the testimony embraced by the motion to strike was properly admissible as against the specific objections made, the motion should have been overruled, though part of the testimony was inadmissible. *Higginbotham v. State*, 42 Fla. 573, 29 South. Rep. 410, 89 Am. St. Rep. 237. For reasons stated above, we think part of the testimony, to the effect that defendant was "ugly when drinking," was proper. In view of the question under which this response was given, it is clear that the meaning of the witness was that the defendant's reputation for peace and quiet was bad when drinking.

Twenty-seven instructions to the jury were requested by the defendant, all of which were refused by the trial judge, and upon these rulings twenty-six assignments of error are presented here. Among them he requested the following:

"2. It is a general principle of law that intoxication is no excuse for crime, but this general principle has this important qualification or modification, so far as it relates to murder in the first degree: A particular or specific intent is absolutely essential in the commission of this crime, and if the mind of the person doing the killing is unable, because of intoxication, at the time of the killing to form this particular or specific intent, there can be no murder in

the first degree, unless the person doing the killing became voluntarily intoxicated for the purpose of killing while intoxicated.

"3. There may, in contemplation of law, be an intention to kill a human being, which may not amount to a premeditated design to kill. Shooting a man intentionally and killing him is not necessarily the same as doing so with a premeditated design to kill him. There may be an intention to kill without its having been premeditated. In order to convict the defendant, M. C. Cook, of murder in the first degree, you must be satisfied from the evidence, beyond a reasonable doubt that the defendant, M. C. Cook, not only had an intention to kill the deceased, but that he actually had a premeditated design to kill him."

The judge, in his ninth charge, instructed the jury that if the defendant, at the time of the killing, was so much intoxicated as not to be able to form a premeditated design to kill, that he could not be convicted of murder in the first degree. This was correct so far as it went, but we think it was not sufficiently full upon the questions of intent and premeditation to render the requested instructions unnecessary. These instructions are substantially the law as laid down in *Garner v. State*, 28 Fla. 113, 9 South. Rep. 835, 29 Am. St. Rep. 232, and should have been given. The subject is further discussed in a subsequent part of this opinion.

The defendant requested the judge to give the following instruction, which was refused: "The law presumes a sober man to intend what he does, but the law does not presume a killing with a premeditated design. This, like every other element of murder in the first degree, is to be inferred by the jury from the facts proved beyond a reasonable doubt." We think this is a correct proposition of law and should have been given. *Garner v. State*, 28 Fla. 113, text 157, 9 South. Rep. 835, 29 Am. St. Rep. 232.

Several assignments of error are based on the refusal of the judge to give requested instructions on the subject

of reasonable doubt, but we think the court, in its thirteenth and fourteenth charges, stated the law as accepted in this State.

The court refused to give the thirteenth requested instruction, which is as follows: "If there is, from the evidence, a probability of the innocence of the defendant, he is entitled to an acquittal." This is embraced in the charges on reasonable doubt given by the court, and there is no error. *Brown v. State,* 46 Fla. 159, 33 South. Rep. 82.

The defendant requested the following instruction, which was refused: "Before the jury can convict the defendant, the evidence must be so strong as to convince each juror of his guilt beyond a reasonable doubt; and if, after considering all the evidence, a single juror has a reasonable doubt as to the defendant's guilt, arising out of any part of the evidence, then the jury can not convict him." This instruction seems to have been taken *verbatim* from *Mitchell v. State,* 129 Ala. 23, 30 South. Rep. 348, where it is approved. The first proposition of this instruction, that each juror must be convinced beyond a reasonable doubt, was considered in *Barker v. State,* 40 Fla. 178, 24 South. Rep. 69. Decisions of the Supreme Courts of Iowa and Washington are cited to the effect that such an instruction need not be given. Decisions from Kansas and Indiana are cited to the effect that it is reversible error not to charge that if any one of the jury, after having considered all the evidence in the case, and after consultation with his fellow jurymen, should entertain a reasonable doubt of defendant's guilt, the jury could not find the defendant guilty. The Alabama rule is also referred to. But the court in this case held that, inasmuch as a proper charge on reasonable doubt had been given to the jury, there was no just ground for inference that error was committed, or any injury done the accused, by a refusal to give the further charge requested. In *Davis v. State,* 63 Ohio St. 173, 57 N. E. Rep. 1099, the trial court was requested to charge the jury that each juror

must be convinced beyond a reasonable doubt of the guilt of the defendants, before uniting on a verdict of guilty. The court refused to give this charge, but did charge that the jury must be convinced beyond a reasonable doubt before finding the defendants guilty. The Supreme Court held that the proper instruction was given, and the charge asked for was properly refused. It says: "The request, as asked, would seem to invite an acquittal, or at least a disagreement, and was therefore misleading. It is true that each juror must be convinced of the guilt of the defendant before uniting in a verdict against him, and this is generally understood; but it is equally true that each should confer with his fellows, and listen to what they have to urge in weighing the evidence, whether it be for or against an acquittal, and not obstinately stand upon his own opinion in the matter. The request asked and refused by the court would tend to such a result. * * * The verdict should be the intelligent consensus of the whole jury, arrived at upon the evidence beyond a reasonable doubt. It should be addressed as an entity, and not as separate individuals. If the accused is in doubt as to whether the verdict is that of each juror, his remedy is to have it polled before it separates." In the case of *Myers v. State*, 43 Fla. 500, 31 South. Rep. 275, this court approved a charge to the jury instructing them "that the jury should agree on a verdict. No juror, from mere pride of opinion, hastily formed or expressed, should refuse to agree; nor, on the other hand, should he surrender any conscientious views founded on the evidence. It is the duty of each juror to reason with his fellows concerning the facts, with an honest desire to arrive at the truth, and with a view of arriving at a verdict. It should be the object of all the jury to arrive at a common conclusion, and, to that end, to deliberate together with calmness. It is your duty to agree upon a verdict, if that be possible without a violation of conscientious convictions." A similar instruction was approved by this court in *Sigsbee*

*v. State,* 43 Fla. 524, 30 South. Rep. 816. These instructions present both features of the duty of the jury, and of each juror, in considering the evidence and endeavoring to reach a correct verdict—the duty to the State and the duty to the defendant. These features are co-ordinate and inseparable, and to state the duty to one without stating the duty to the other in some proper form of words might, and probably would, cause the jury to think that, in the judgment of the judge, it was necessary, in view of the facts in the case under consideration, to emphasize one particular feature of their duty, in order that justice might be done, and thus the jury might be misled. As to that feature of the instruction which implies that a reasonable doubt may arise out of any part of the evidence, the contrary doctrine is settled in this State in the case of *Bryant v. State,* 34 Fla. 291, 16 South. Rep. 177. It is there held that a reasonable doubt can not arise from considering a part or parcel of the testimony, and that the reasonable doubt which the law requires shall acquit the defendant is one that arises in the minds of the jury after considering, comparing and weighing all the testimony.

Instructions eighteen and twenty-one requested by defendant are too broad, as there is not a particle of evidence that Cook killed Smith in the perpetration of, or attempt to perpetrate, arson, rape, robbery, or burglary.

In his twenty-second instruction the defendant requested the judge to charge the substance and effect of section 2924, Revised Statutes, authorizing a majority of the jury to recommend the defendant to the mercy of the court. The question was passed on by this court in *Metzger v. State,* 18 Fla. 481, text 492; and it was held that the judge is not required by law to give any instruction to the jury on the subject, but that counsel might read the act to the court and jury if they desire to do so, and the judge may give it to the jury if desired. In *Garner v. State,* 28 Fla. 113, 9 South. Rep. 835, 29 Am. St. Rep. 232, this court held that if the

judge instructs the jury that a majority of them may recommend a person convicted to the mercy of the court, the function will be best performed by simply giving the terms of the statute to the jury, and informing them that the making or witholding of the recommendation is a matter which the law has placed entirely in the discretion of a majority of them. The judge, in his charge, gave the jury the substance of the statute, and there is no error.

The defendant requested the court to instruct the jury that the good reputation of the defendant Cook, if proven by the evidence, may be sufficient to raise a reasonable doubt of his guilt. The court, in its fifteenth charge, gave the law substantially on this question, as recognized in this State.

The defendant requested the court to instruct the jury that they should not convict from prejudice or upon insufficient evidence. We think, in view of the nature of the evidence and circumstances of this case, this instruction should have been given. *Doyle v. State,* 39 Fla. 155, 22 South. Rep. 272, 63 Am. St. Rep. 159.

The third charge given by the court is as follows: "Such killing, when perpetrated by an act imminently dangerous to others, evincing a depraved mind, with utter disregard for human life, without any premeditated design to effect the death of any particular individual, is murder in the second degree." This charge differs from the definition of murder in the second degree contained in section 2380, Revised Statutes, in several particulars, *viz*: it substitutes "imminently dangerous to others" for "imminently dangerous to another," and "utter disregard for human life" for "regardless of human life."

The seventh and eighth charges given by the court are erroneous for the same reason. Under these charges the jury were precluded from convicting the defendant of murder in the second degree, inasmuch as the evidence did not show an act imminently dangerous to others, *i. e.,* more than

one person, but only so to Smith. *Marshall v. State,* 32 Fla. 462, text 464, 14 South. Rep. 92.

It is objected that the judge, in his fourth and other charges, excluded a definition of murder in the third degree. We do not think there was any error in this, as there was no evidence in the case which tended to show that the "killing was perpretrated without any design to effect death by a person engaged in the commission of any felony other than arson, rape, robbery or burglary."

It is vehemently urged that the court below affirmatively charged the jury not to bring in a verdict of murder in the third degree. We do not find in the record any such affirmative charge.

It is contended that the court erred in its seventh charge in not confining the venue to Brevard county, Florida, but in ignoring it. The omission would only be erroneous where there was a question as to the proof of venue. *Ragsdale v. State,* 134 Ala. 24, 32 South. Rep. 674.

The tenth charge is objected to because it concludes as follows: "and that, when he fired the shot, he intended to kill Smith or any particular human being, it would be murder in the first degree." The objection is well taken. For the words "he intended to kill" the following should be substituted: "He did so from a premeditated design to effect the death of," and the word "particular" should be omitted.

The defendant objects to the latter part of the eleventh charge of the judge. The whole charge is as follows: "No specific time is required to constitute premeditation. If the mind of the accused was in a condition to form a purpose, and there was sufficient time for the forming of that purpose, and for the mind to be conscious of that purpose to kill, it is sufficient time to constitute premeditation; and if the jury believe from the evidence, beyond a reasonable doubt, that the defendant had fully formed a purpose to shoot and kill Smith, and that he was conscious of that pur-

pose when he fired the shot, they will find the defendant guilty of murder in the first degree." Because of the fact that, after an exhaustive investigation, we are satisfied that this charge does not afford a clear and correct interpretation of the meaning and design of our legislature in the use of the phrase "premeditated design," in its statutory definition of the crime of murder in the first degree and of its high importance as involving human life, we deem it necessary to go more elaborately into the discussion of this charge than would otherwise be necessary. The language of the statute is as follows: "The unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed, or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery or burglary, shall be murder in the first degree." In the case at bar we are not concerned with that kind of murder committed in the perpetration of, or attempt to perpetrate, the felonies named. Our statute defining the different degrees of murder, brought forward into section 2380 of the Revised Statutes, was enacted here as section 2 of sub-chapter III of chapter 1637, page 63, laws of Florida, approved August 6th, 1868. Before that time a similar statute had been adopted in Wisconsin, and it is said by the courts of that State that the phrase "premeditated design" was borrowed from a statute of New York using that phrase in defining murder in the first degree.

In the case of *Sullivan v. People,* 1 Park. Cr. Rep. 347, the Supreme Court of New York, in an elaborate opinion rendered in 1852, gives the history, causes and purposes of the statutory change of the definition of murder in the first degree, and, quoting from authorities to show the meaning of the word "premeditated," on pages 352 and 353, say: "These quotations show the general and popular understanding of the word, and that is the legislative understanding where technical words are not used, or words relating

to a trade or art.   But here the legislature has used a still simpler word, *viz*: 'premeditated design.'   There must be, therefore, not only the design to kill, but the design must have been the subject of meditation or reflection before, as the prefix 'pre' clearly requires.   Before what is this premeditated design of killing to be, except before the act that was meditated, *viz*: the fatal blow by which the killing was accomplished.   The very requirement that the design shall be thought of and meditated before the act shall be committed which is the cause of the death, admits that there is an interval between the design or intention and the commission of the act.   We have no right to strike so material a part of the word as this which gives particular force to the ordinary meaning of the rest of the word.   This interpretation of the word also corresponds with the expressed views of the revisors, which seems to have been to confine this part of the definition of murder to what was frequently called cases of 'express malice.' "

This decision was overruled by the Court of Appeals of New York in the case of *People v. Clark,* reported in 7 N. Y., p. 385.   The reasoning of the court is as follows : "The words 'premeditated,' 'aforethought' and 'prepense,' possess etymologically the same meaning.   They are, in truth, the Latin and Saxon synonyms, expressing a single idea and possess in law precisely the same force.   The statute, so far as this term is concerned, has not altered the law.   'Malice prepense,' however, had attained a broader meaning than belongs to the term 'premeditated design.'   The intent to take life was not necessary to constitute malice prepense.   Even express malice or malice in fact is defined to be a deliberate intention of doing *any* bodily harm to another, unauthorized by law (Hale's P. C. 451), and by no means necessarily involved an intent to take life.   The change, therefore, which the statute has effected by substituting the word 'design' in place of 'malice,' is not to alter the nature or degree of the premeditation requisite to the

crime of murder, but to require—what the common law did not require—the existence of an actual intention to kill to constitute that crime, under the first subdivision of the fifth section. This view of the law is well sustained by the decisions in those States where the crime of murder has been distinguished by statute into murder in the first and second degrees. In those States wilful, deliberate, and premeditated killing is murder in the first degree. The cases are very ably reviewed in Wharton's Am. Crim. Law (2d ed.), p. 420, *et seq.,* and the clear result of them is that in cases of *deliberate* (italics ours) homicide, where there is a specific intention to take life, the offense, if consummated, is murder in the first degree. The degree of deliberation is not different from that required by the common law." It behooves us to examine this reasoning with some care. The Court of Appeals does not refer in any way to the reasonings of the Supreme Court. It does not refer to the fact that the revisors stated in their report "there was nothing so much wanted in the common law as a settled line of distinction between murder and manslaughter, which were then so nearly connected, and run into each other so much, that a lamentable uncertainty prevailed, which operated as well to screen the guilty as to expose the innocent, and that the first step to such a distinction is the definition of murder;" nor does it refer to the following reasoning of the court: "It is evident, therefore, that it was their intention to use language which should be so clear as to remove this uncertainty, and to make it unnecessary to examine the former adjudications on the subject. For, if the former law was to be retained, and the former decisions resorted to as authority as to what the present law should be, all the old uncertainty must still remain. The same motives must have influenced the legislature, for this uncertainty was but faintly portrayed by the revisors, as any one will experience who will attempt to reconcile the old decisions; and there

was no subject which needed revision more both on that account and on account of its vast importance. The revisers accordingly abandoned the technical phrase which was appropriated to the description of the motive of the murder—'malice aforethought'—and which had in process of time acquired a legal meaning different from its primitive meaning, and substituted the 'untechnical' words 'premeditated design,' that a law in which the whole State and every individual in the State may be concerned might be understood by each, in the sense which every man, professional or not, would, on the first impression, believe it was intended to have." These explanations of the purposes and object of the statutory change are not mentioned by the Court of Appeals, but ignoring them, and by holding that "premeditate" was simply the "prepense" of the common law, which by a process of construction had come to have no meaning at all, and by holding that "design" was only the "malice" of the common law, with an added qualification of "intentional," the court concluded that "premeditated design to kill" meant only an intention to kill. In thus construing the statute the Court of Appeals put into operation those technical principles of construction which the Supreme Court had stated it was the purpose of the revision to avoid. The result of this decision was that the legislature of New York, evidently dissatisfied with the state of the law as it was left by this decision, amended the law of murder in the first degree by using the words "when committed from a *deliberate* and premeditated design." This emendation struck the courts with some force, and since then the Court of Appeals of New York has adopted a definition of murder in the first degree which construes the words of the statute in their "untechnical" meaning. The definition is as follows: "Under the statute there must not only be an intention to kill but there must also be a deliberate and premeditated design to kill. Such design must precede the killing by some appreciable space of time. But the time need

not be long.  It must be sufficient for some reflection or consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill.  The human mind acts with celerity which it is sometimes impossible to measure, and whether a deliberate or premeditated design to kill was formed must be determined from all of the circumstances of the case." *People v. Majone,* 91 N. Y. 211; *People v. Decker,* 157 N. Y. 186, 51 N. E. Rep. 1018. If it had followed the decisions of Pennsylvania and the cases cited in Wharton's Cr. Law in construing this last statute, as it did in construing the first, there would have been no difficulty in construing away the meaning of "deliberate," as it had construed away the meaning of "premeditated," for the Pennsylvania statute uses the words "wilful, deliberate and premeditated killing," and the Pennsylvania courts seem to hold that these words only mean an intent to take life. *Keenan v. Commonwealth,* 44 Pa. St. 55, 84 Am. Dec. 414.  It does not seem to have occurred to the New York Court of Appeals, in *People v. Clark,* that the object of the American statutes changing the common law doctrine of murder was not to change the bounds of murder, or make anything murder which was not such before, but simply to draw a partition line through the old field, and give new names to the parts, in order that the punishment might be adjusted to the atrocity of the crime.  2 Bish. New Crim Law, sec. 724; *Whiteford v. Commonwealth,* 6 Rand. (Va.) 721, S. C. 18 Am. Dec. 771, and note p. 774, *et seq.*  If this now universally admitted theory had been recognized and applied upon the first adoption of the statutes, it is plain that the law would have been spared the confusion which has been thrown into it by the failure so to do.  There was no occasion whatever to discuss "malice prepense" to show that "premeditated" only meant prepense, and that "prepense," by construction, had come to have no meaning.  See an interesting note on "malice aforethought," 4 Hammond's Blackstone, p. 256, and also the note above referred to in

18 Am. Dec. 774, *et seq.,* where Mr. Freeman has collated the American Statutes, and has discussed them, and the decisions construing them.    Mr. Freeman, on page 781, says : "To say that a murder was of the first degree, simply because it was intended at the moment, would be to construe the words 'deliberate' and 'premeditated' out of the statute." In the case of *State v. Johnson,* 8 Iowa 525, S. C. 74 Am. Dec. 321, the court says that the language of the statute of that State defining murder in the first degree is that all murder which is perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, etc., is murder in the first degree; that the statutes of Pennsylvania, New Hampshire, Michigan, New Jersey, Tennessee, Alabama and Virginia use the same or similar language; that to meditate is to deliberate, but to premeditate implies an act or state of the mind going before meditation or deliberation.    "It means to meditate or deliberate before concluding to do the deed ; not alone to wilfully take life, nor yet to do it deliberately, but to predetermine, to contrive by previous meditation," and the court says that an instruction given in the case was erroneous "in that it omits the element of premeditation" in defining murder in the first degree.    In the case of *State v. Mitchell,* 64 Mo. 191, the trial judge instructed the jury as follows : "The court instructs the jury that if they believe from the evidence that defendant did wilfully (that is intentionally) kill deceased, then, and in such case there is no murder in the second degree, or manslaughter in the first, third or fourth degrees, in the case, but the offense is either murder in the first degree or manslaughter in the second degree, or justifiable homicide, accordingly as you may find the facts in proof ; that is if the defendant wilfully killed the deceased, in malice, that is, without sufficient cause or excuse, it is murder in the first degree."    The court held the instruction erroneous, as omitting the elements of deliberation and premeditation.    See, also, *State v. Foster,* 61 Mo. 549.    The

Indiana statute provides that "if any person of sound mind shall purposely and with premeditated malice, or in the perpetration or attempt to perpetrate, etc., kill any human being, such person shall be guilty of murder in the first degree." Rev. St. 1876, pt. 3, c. 7, sec. 2. In *Fahnestock v. State,* 23 Ind. (Harrison) 231, text 262, the court says: "But to render the act murder in the first degree, something more than the purpose or intention to commit it is requisite; the purpose must be *premeditated. Webster* defines *premeditate* thus: '1. To think, consider, or revolve in the mind beforehand; to deliberate; to have formed in the mind by previous thought or meditation. 2. Previously contrived, designed, or intended; deliberate, as premeditated murder.' The *principle* involved, by which murder in the first degree is distinguished from murder in the second degree, is this: In the former, premeditated malice requires that there should be time and opportunity for deliberate thought; and that after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act. That being done, then, no difference how soon afterward the fatal resolve is carried into execution, it is murder in the first degree." The statute of California is similar to that of Pennsylvania in defining murder in the first degree, *viz:* "All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate or premeditated killing or," etc., "shall be deemed murder in the first degree." In the case of *People v. Long,* 39 Cal. 694, the court held, page 696: "To constitute murder of the first degree, there must be not only an intention to take life, but it must also be a deliberate and premeditated killing." There is a similar statute in Texas and in the case of *Atkinson v. State,* 20 Texas 522, the court, on page 530, says: "The question arises on the construction of the words 'premeditated and deliberate killing.' As murder in the first degree

is the only grade which is punished capitally, it must be presumed that it was the object of the legislature to designate the most atrocious species of murder, by the use of the terms 'premeditated and deliberate killing.' They should receive such construction, if their import, in connection with the subject-matter, will permit it, as will accomplish that object. They are not technical words, with a defined meaning by the common law. They are familiar words in common use, employed in the statute not to extend or enlarge the meaning of the words malice aforethought, but to designate a class of offenses of darkest shade, included within that term (citations)." The court then proceeds to give the ordinary meaning of those words, and states that they refer to the state of mind of the slayer at the time of the killing, as to whether it was sufficiently cool and self-possessed to consider of and contemplate the nature of the act, then about to be done, or whether the design was the sudden and rash conception of an enraged mind. On page 532 the court refers approvingly to the decision of the Supreme Court in the case of *Sullivan (Clark) v. State,* 1 Parker's Cr. Rep. 347, hereinbefore referred to and quoted from.

In the case of *State v. Williams,* 69 Mo. 110, the court decided that an instruction, " if said defendant John Williams had time to think, and did intend to kill deceased for a moment, then the killing is a wilful, deliberate and premeditated killing," was erroneous, as there may be an unlawful intentional killing that is not murder in the first degree, and that whether the killing was deliberate or (and) premeditated was a matter that must be left to the jury.

In the case of *Daughdrill v. State,* 113 Ala. 7, 21 South. Rep. 378, the court had occasion to determine the meaning of the words "deliberate" and "premeditated" and on page 32 of the opinion went to the extreme of holding that those words as used in the statute, "mean only this: That the slayer must intend before the blow is delivered,

though it be only for an instant of time before, that he will strike at the time he does strike, and that death will be the result of the blow." One of the cases cited to support this definition is *Mitchell v. State,* 60 Ala. 26. In that case the venerated Judge STONE delivered the opinion. He states that the statute (Code 1876, sec. 4295) divides common law murder into two grades—murder in the first and second degrees: that murder in the first degree is divided into four classes: "First, homicides, perpetrated by 'poison, lying in wait, or any other kind or wilful, deliberate, malicious and premeditated killing;' that to come within the last clause, the act must be qualified by each of the named adjectives: Wilful—governed by the will, without yielding to reason. Deliberate—formed with deliberation, in contradistinction to a sudden and rash act. Malicious—with fixed hate, or done with wicked intentions or motives, not the result of sudden passion. Premeditated—contrived or designed previously. All these qualities must co-exist to bring the crime within this clause. The law has declared no length of time these wicked elements shall be shown to have existed; and they may be all grouped under the very expressive phrase, *'formed design.'*"

In the case of *Smith v. State,* 68 Ala., 424, the same judge says: "In *Mitchell v. State, supra,* we defined what constitutes murder in the first degree under our statute. It is not every killing with malice aforethought which rises to the bad eminence of murder in the first degree. One class is defined as a wilful, deliberate, malicious and premeditated killing. In defining that class to juries, *each and all of the qualifying adjectives should be employed* (italics ours), for unless the killing falls precisely within one of the classes enumerated in section 4275 (4295) of the code, and therein denounced as murder in the first degree, it is murder in the second degree, manslaughter or excusable homicide." These and other Alabama cases which might be cited, do not sustain, in our opinion, the doctrine laid

down in *Doughdrill v. State,* 113 Ala., *supra.* The two cited cases show clearly that the statutory elements of murder in the first degree must always exist to justify a conviction of murder in the first degree; that the very qualifying adjectives of the statute should be given to the jury; and the danger which may lurk in a paraphrase is illustrated in *Mitchell v. State,* in which the judge says that the elements of murder are grouped under the phrase "formed design;" for no one, unless he had so informed us, would suppose that that phrase was broad enough to cover a malicious killing. It is true that taken with what precedes it, we might so understand it, just as we would understand that the word "horse" meant "cow" if we had been told that the word "horse" was used to mean "cow." Nor is it clear that it covers other phases of murder.

We will now consider some of the decisions of the Wisconsin court. As has been said ours is similar to the Wisconsin statute, and in each "the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when, etc., is murder in the first degree." The definition of "premeditated design," adopted in *Ernest v. State,* 20 Fla. 383, seems to have been taken literally from page 245 of the decision in the case of *Hogan v. State,* 36 Wis. 226, which was afterwards overruled in that State in two cases, but was subsequently re-affirmed and followed in the same court in the case of *Perugi v. State,* 104 Wis. 230, 80 N. W. Rep. 593, 76 Am. St. Rep. 865. We will quote the reasoning of the Wisconsin court, upon which its definition is based, in its own language in the case of *Hogan v. State, supra*: "We take the 'premeditated design' of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent, and need not be slow or last long. This very plainly appears, not only by the force of the words used, but also by the ap-

parent use throughout the definition of murder and man-
slaughter, of the terms 'design' and 'premeditated de-
sign' to effect death, as co-equal terms. The defini-
tions of murder in the third degree, and of manslaughter
in the first, second and third degrees, use the words
'without design to effect death,' thus positively ex-
cluding such a design. And the design so excluded is
necessarily the premeditated design of murder in the first
degree." We approve heartily of the last quoted sentence.
Undoubtedly the "design" mentioned in all the sections of
the statute is "premeditated design" and where "design"
is used without the qualifying word "premeditated," that
word is understood. Any other construction would make
a senseless jumble of the statute. But if the "design"
mentioned in all sections of the statute is "premeditated
design," how, in the name of reason, does it follow that it
can in any section, and especially in the one defining murder
in the first degree, be anything less than "premeditated de-
sign?" And yet that is the plain doctrine of the opinion.
In other words, when under a rhetorical figure a part is
used to signify the whole, then the whole only means what
a part of the whole means. And it is by this reasoning that
the phrase "premeditated design" was emasculated, so as to
mean only design, or intent, without qualification. It is
impossible for us, try as we may, to gain the consent of our
judgment to such reasoning or its consequences. We
believe it to be an unqualified violation of the essential laws
of deduction. For a whole is always equal to, and never
less than the sum of its parts; and conversely a part is never
equal to a whole, though under the rhetorical figure of
synechdoche, a part may be put for the whole, or the whole
for a part, and when so used a part always signifies the
whole and no less than the whole. This doctrine of the
*Hogan* case was current in Wisconsin for several years,
and was then overruled; but in the case of *Perugi v. State,*
104 Wis. *supra,* it was revived, and approved on page 242

of the opinion. We have read this case with as close atten-
tion as it is possible for us to give to a subject, in the en-
deavor to ascertain the true teaching of the case. We find
that in the sixth headnote it formulates the law in the fol-
lowing words: "Every homicide, not justifiable or ex-
cusable, perpetrated in pursuance of a previous intention
to kill, distinctly formed in the slayer's mind, is murder in
the first degree, even though the killing followed instantly
the formation of such intention." We find that to support
this formulated doctrine the court reasons on page 241, as
follows: "We can not resist the conclusion that every
killing not justifiable, done with that degree of *deliberation
and with an intent or design* sufficiently fixed and settled
in the mind as to come within the rule of 'premeditated
design' *laid down in the statute, and interpreted by the de-
cisions* of this court, is murder in the first degree, and any
expression in the *Terrell* case, or the *Sullivan* case to the
contrary ought not to be adhered to. The intentional killing
that may exist consistent with manslaughter in the second
degree, is the intent which springs from momentary impulse,
when the mind is unbalanced, and there is no opportunity
for consideration or deliberation." (The italics are ours.)
Eliminating the words "and interpreted by the decisions
of this court," we think the foregoing affords a fair defini-
tion of murder in the first degree. But its doctrine is, in
our opinion, in conflict with its headnote. For where is
there in the quoted headnote any expression necessarily
equivalent to the words "with that degree of deliberation
and with an intent or design sufficiently fixed and settled
in the mind as to come within the rule of premeditated de-
sign," or that necessarily implies there must be opportunity
for "consideration or deliberation?" And the reasoning
on page 242 plainly shows that the court did not consider
that the words "intent then distinctly formed in the mind"
as sufficient by and of themselves, but they were only suffi-
cient because followed by and explained by the phrase

"premeditated design," and because they were so followed,
the court thought the jury could not have been misled. The
headnote, however, does not in any way qualify or explain
the words "distinctly formed in the mind," but they them-
selves are simply used to explain what precedes them, *viz*:
a previous intention to kill. The headnote uses the words
"distinctly formed in the mind" as equivalent to "premedi-
tated design." The opinion then proceeds to quote from
many decisions of other courts in support of its views. One
of them, the case of *Doughdrill v. State,* 113 Ala. 7, 21 South.
Rep. 378, fairly sustains the doctrine of the headnote; but
the Virginia case and the New York cases are, in our judg-
ment, by their plain language, inconsistent with that doc-
trine. The quotation from the Virginia case is as follows:
"The killing must be a predetermined killing upon consid-
eration, and not a sudden killing upon the momentary ex-
citement and impulse of passion." As the word "considera-
tion" is defined as "the act of considering; continuous and
careful thought; contemplation; deliberation" (Webster's
Unabridged Dic.), we can clearly perceive that a killing
may have been "perpetrated in pursuance of a previous
intention to kill distinctly formed in the slayer's mind," and
yet not have been murder in the first degree, under this
definition, for that previous intention may have been formed
before the killing, and distinctly formed, and yet not have
been the result of continuous and careful thought, contem-
plation or deliberation. Even in some phases of man-
slaughter there is a previous intention to kill, and it may be
distinctly formed in the mind. Furthermore, may not other
phases of unlawful killing arise under sections 2378 and 2388,
as established by its decisions is stated by Judge EARL in
Revised Statutes, where there is no element of passion, but
presenting the elements of an unnecessary or unjustifiable
killing, which would not be murder in the first degree, but
would be murder in a lower degree or manslaughter? We
refer to only one other of the New York cases referred to
in the opinion under examination, and that is the case of

*People v. Decker,* 157 N. Y. 186, 51 N. E. Rep. 1018, for this discussion is already too protracted. On page 193, the court say: "The premeditation and deliberation necessary to constitute the crime of murder in the first degree has frequently been under consideration by this court, and the rule *People v. Majone*" (91 N. Y. 211). We have given that definition in a previous portion of this opinion. We understand that the Wisconsin court quotes this case simply to support its view in regard to the time within which the design to kill in murder in the first degree may be formed. We also understand from page 241 of the *Hogan* case that the Wisconsin court refuses to follow the New York court in its construction of the statute defining unlawful homicide. But this, though true, does not detract from the definition of premeditated design given by the New York court, and that definition is totally at variance with the quoted headnote. The New York definition is plainly divisible into two parts: The first part defines "premeditated design," the second part defines or fixes the limits of the time, so far as it can be defined, within which premeditated design may be formed. We can discover no defect in this definition, but it is not the definition of murder in the first degree given in the headnote quoted from *Perugi v. State.* We think that this definition approved in *People v. Decker, supra* (leaving out, if you please, the word "deliberate" where it occurs, for that word adds no element to the crime which it not embraced in the word "premeditated."), is a correct definition of murder in the first degree, under our statute, both as to the mental attitude of the slayer and the time for forming a premeditated design. We understand the law of murder in the first degree as formulated in the second and third headnotes in *Lovett v. State,* 30 Fla. 142, 11 South. Rep. 550, L. R. A. 705, to be in substantial conformity with the definition in *People v. Decker, supra.* Furthermore, in a case subsequent to *Perugi v. State, viz*: in the case of *Miller v. State,* 106

Wis. 156, 81 N. W. Rep. 1020, the court, on page 160, uses this language: "The court, after reading the statutory definition of murder in the first degree, charged the jury on this subject as follows: 'You will note carefully the words 'premeditated design.' While the law requires, in order to constitute murder in the first degree, that the killing shall be wilful, deliberate and premeditated, it does not require that the wilful intent, premeditation, or deliberation shall exist for any particular length of time before the crime is committed. It is sufficient if there was a design and determination to kill, distinctly framed in the defendant's mind, before he struck the fatal blow which caused the death of Willard Taylor. If you find from the evidence, beyond all reasonable doubt, that the defendant, at any time before striking the blow which caused Taylor's death, had formed in his mind a wilful, deliberate and premeditated design to take his life, and that such blow was struck in furtherance of such design, without any justifiable cause therefor, as will be hereafter explained, then you should find defendant guilty of murder in the first degree.' It will be at once seen (says the court) that the instruction given by the court is in entire accord with the doctrines laid down by this court in the recent case of *Perugi v. State,* 104 Wis. 230 (80 N. W. Rep. 593, 76 Am. St. Rep. 865)," etc. We are at a loss to know what the court means by the *doctrines* of *Perugi v. State.* As we have seen from the sixth headnote, a homicide not justifiable or excusable, perpetrated in pursuance of a previous intention to kill, distinctly ·formed in the slayer's mind, is murder in the first degree. It is not said in this headnote that the law requires the killing shall be wilful, deliberate and premeditated. It is not said in this headnote that if the slayer had formed in his mind "a wilful, deliberate and permeditated design" to take the life of the deceased, and that if the fatal blow was struck "in furtherance of such design," it would be murder in the first degree. Nor are there any words in the headnote

which by any natural and ordinary meaning could be held the equivalents of those used in the charge which is approved in 106 Wis., *supra*. Are we to understand then, that in this last case the court abandons the law as laid down in *Hogan v. State,* and *Perugi v. State,* and substitutes the definition of murder in the first degree in the New York cases it quotes in *Perugi v. State, viz: People v. Majone,* 91 N. Y. 211, and *People v. Decker,* 157 N. Y. 186, 51 N. E. Rep. 1018? We are unable to answer this question, nor do we understand the status of the law in Wisconsin. See, also, *McDonald v. State,* 78 Miss. 369, 29 South. Rep. 171; *Lofton v. State,* 79 Miss. 723, 31 South. Rep. 420. In the case of *Garner v. State,* 28 Fla. 113, 9 South. Rep. 835, Am. St. Rep. 232, this court had occasion to show that there was a difference between the meaning of "premeditation" and "intent," and that there might be "intent" without premeditation. In *Lovett v. State,* 30 Fla. 142, text 154, 11 South. Rep. 550, 17 L. R. A. 705, the Chief Justice, in discussing the phrase "premeditated design," states in substance that it is an "intention formed upon premeditation of the subject" which constitutes murder in the first degree. In this case the words "premeditated" and "deliberation" are used as synonyms. Every voluntary act may in a certain sense be said to be done with "intent" or "purpose;" but every voluntary killing, though unlawful, is not murder in the first degree. *Williams v. State,* 41 Fla. 295, 26 South. Rep. 184. It should not be forgotten that, except in the cases mentioned in sections 2385 to 2392 inclusive, Revised Statutes, the statute does not define manslaughter in *positive* terms. It defines murder in the first, second and third degrees in positive terms, and then in section 2384, in negative terms, defines manslaughter as "the killing of a human being by the act, procurement or culpable negligence of another in cases where such killing shall not be justifiable or excusable homicide, nor murder according to the provisions of this article." Murder in the first degree is positively defined as the "un-

lawful killing of a human being when perpetrated from a
premeditated design to effect the death of the person killed,
or any human being," etc.   What right have the courts to
abandon the plain and positive statutory definition of murder
in the first degree and adopt other words and phrases in lieu
thereof, such language as, "if the jury believe from the evi-
dence beyond a reasonable doubt that the defendant had a
fully formed purpose to shoot and kill Smith, and that he was
conscious of that purpose when he fired the shot, they will
find the defendant guilty of murder in the first degree?"
Voluntary action may be the result of any phase of purpose
—from the most deliberate and premeditated down to the
most impulsive.   Our law of unlawful homicide was de-
signed to embrace all these phases, but it was not designed
that one phase should overlap or be confused with another.
.Now, who can say that a jury will attach to the quoted
language the same meaning as they would to the phrase
"premeditated design?"   Is it not at least a fairly debatable
question whether they have the same meaning, either in the
ordinary understanding or in a mind accustomed to mental
introspection?   Who can determine with anything like pre-
cision wherein a "fully formed purpose" differs from a
purpose not "fully formed?"   Is it not conceivable that a
man acting under great provocation may shoot and kill
another in the heat of passion without premeditated design,
and yet have a fully formed purpose to kill, and be conscious
of his purpose?   Is it not conceivable that a public officer
in arresting a felon fleeing from justice, may, in the excite-
ment of pursuit, shoot and kill the felon, may in shooting
have a fully formed purpose to kill, and be conscious of that
purpose, and yet not have a premeditated design to kill?
If these are possible hypotheses, and we think they are, the
slayer, under the statute, would not be guilty of murder in
the first degree, though, under the charge we are considering,
he would be, for in neither case should the crime of the slayer
be classed with that of the man who lies in wait to kill his

adversary, or who kills under other conditions showing a clear premeditated design to kill. It is only when a positive and explicit definition of murder has been given that we can determine by exclusion what constitutes manslaughter.

We intend no criticism of the presiding judge who gave the charge under discussion, for similar ones have been used by very eminent and learned courts. But we do not think it conforms to the definition of murder in the first degree under our statute. A definition, to be adequate, should clearly and distinctly delimit the subject defined from its co-ordinates. A definition of murder in the first degree should not leave the boundary between that crime and other degrees of murder and manslaughter in a hazy or confused condition. And this leads us to repeat the language of Judge STONE in *Smith v. State,* 68 Ala. 424 (*supra*) : "In defining this class (murder in the first degree) to juries, each and all of the qualifying adjectives (of the statute) should be employed." We think the object of the statute was to divide the cases embraced in the common law definition of murder, classing the most atrocious under murder in the first degree, in which the death penalty is inflicted, and grading down the punishment of other classes according to their relative heinousness. We think the meaning of the words "premeditated design," not being technical words of the common law, is to be found in the meaning of those words as used in the best dictionaries and standard authorities. Premeditation is composed of "pre" and "meditation," and means the act of premeditating—previous deliberation—forethought. Deliberation and premeditation are synonymous. (Cent. Dictionary.) "And Isaac went out to meditate in the field at eventide." (Gen. 24-63.) "This book of the law shall not depart out of thy mouth, but thou shalt meditate thereon day and night." (Josh. 1-8.) " Meditate upon these things; give thyself wholly to them." (1 Tim. 4-15.) "Let the words of my mouth and the meditations of my heart be acceptable," etc. (Psalm 19-14.) The

word meditate, as thus used in the Bible, implies all the thoughts which can be generated in the mind by the exercise of the discursive or regulative faculties. It certainly implies everything that is implied in the word "deliberate" and more. It is not necessary to say that the Bible furnishes a high standard of the English language, or that it is the book from which the masses of the people derive their notions of the meaning of words.

Furthermore, if one, fully conscious of his purpose or intention to kill another, does, in pursuance of that intention, shoot and kill that other, and is *thereby* shown to have done the killing from a "premeditated" design, and is guilty of murder in the first degree, it is not difficult to prove that all the State has to show in order to convict "A" of murder in the first degree, is that "A" shot "B" and killed him; in other words, that, the killing being proved, "A" is guilty of murder. For every man is presumed to be sane. Consciousness is a necessary attribute of the sane mind. It is the indispensable condition in which the mind realizes its knowledge, its feelings, its volitions. Every man is presumed to intend the natural or probable consequences of his acts, therefore, "A" having killed "B," he is presumed to be fully conscious of his acts and intentions, and is presumed to have consciously intended to kill "B." But if he killed "B" and was conscious of his intention to kill "B," when he killed him, he is guilty of premeditated murder, for premeditated murder is a homicide committed from a fully conscious intention to kill. This conclusion, however, is directly in the teeth of our decisions, for the law does not presume premeditation from the simple fact of a killing. Premeditation must be shown by the facts and circumstances of the case. *Adams v. State,* 28 Fla. 511, text 552, 533, 10 South. Rep. 106. It may be said that these views, if they prevail, will overthrow previous decisions of this court. Undoubtedly the effect will be to modify the definition of premeditated design in *Ernest v. State,* and thus afford a

clearer distinction between the premeditation of murder in the first degree, and the intention to kill which may exist in other phases of unlawful homicide. But we are not aware of any previous decision in this State which in any headnote formulates the law in the exact language of the charge under consideration, and such as we have examined can be differentiated from it. It can not be said that we are disturbing a settled and clear construction of the statute, when there is no settled and clear construction discriminating the meaning of what is called the intentional killing in murder from the intentional killing which may exist in manslaughter. Granting, however, that such will be the effect, is that a good reason why the views herein set forth should not be adopted? Did the court in *Perugi v. State* decline to express its convictions because previous decisions were thereby overruled? It is apparent that they did not. In this connection we invite attention to Mr. Bishop's views as contained in the second volume of his New Criminal Procedure from sections 571 to 587 inclusive. Mr. Bishop there discusses the manner in which some courts have by construction mutilated statutory definitions of murder in the first degree. He expresses his views of the error of such decisions in no uncertain terms. He contends that such decisions are not to be regarded as *"stare decisis."* He says in section 587 that "it is a familiar doctrine that a decision from a court overlooking a controlling statute, or any other pivotal thing, is not a rule for the future under the maxim *'stare decisis.'"* The above discussion and conclusions with reference to the tenth and eleventh charges of the court below, has the unanimous approval of the three members of the court comprising Division A, but as it is not concurred in by the three members of the court comprising Division B, the question presented by such charges is not now decided.

The last ground of the motion for a new trial is as follows: "The jury after having been duly chosen, empanelled and sworn in chief, and after having heard a part of the

State's evidence, was, contrary to law, allowed to separate, and did separate before rendering a verdict, and that while separated from the remainder of the jury, one juror, J. H. Wynn, held a private conversation with a person not an officer of the court, and not in the presence of an officer of the court." It is not necessary to pass on this ground, as upon a new trial it is not probable that a similar incident will occur.

An assignment of error is based upon the refusal of the court to grant a motion in arrest of judgment, and the only argument presented in the brief to sustain this assignment is a reference to *Keech v. State,* 15 Fla. 591. We suppose this case is cited to support the contention that the indictment does not show the nature and character of the wound, or the location thereof. The indictment alleges in substance that Smith was struck on the breast with leaden balls which inflicted a mortal wound from which he died. The rule on these points stated in *Keech v. State,* is overruled in *Hodge v. State,* 26 Fla. 11, 7 South. Rep. 593; *Walker v. State,* 34 Fla. 167, 16 South. Rep. 80.

As this case must be sent back for a new trial, we deem it proper to observe that several of the charges of the court seem to assume as an admitted fact that the defendant, Cook, shot and killed Smith. This was a fact in issue, and we can not discover from the evidence that it was admitted. We think also that the last sentence of the fourteenth charge of the court was confused and misleading. It is in these words: "If the jury in this case have such a doubt in their minds, arising from the evidence or lack of evidence, as to 'all' the material allegations of the indictment, they will give the defendant the benefit of such doubt and find him guilty of such degree of crime as they believe, from the evidence, beyond a reasonable doubt, him to be guilty of, and, if guilty of no crime, then acquit." We do not think the jury would be authorized to convict the defendant of any degree of crime if they had a reasonable doubt arising from

the evidence, or lack of evidence, as to *all* the material allegations of the indictment.

The foregoing, we· think, disposes of all the assignments of error which it is necessary to discuss. The judgment is reversed at the cost of Brevard county, Florida, and a new trial ordered.

TAYLOR, C. J., and SHACKLEFORD, J., concur.

CARTER, P. J.—I. The conclusion of the tenth instruction given by the court, with the exception of the use of the word "particular," is expressly approved in *Savage v. State,* 18 Fla. 909, and *Irwin v. State,* 19 Fla. 872, and taken in connection with the preceding part of the charge, which · is not questioned, is correct under the authority of those decisions. The use of the word "particular" was favorable to the defendant and unfavorable to the State, and does not, therefore, constitute ground for reversal. Still it has no proper place in the charge and should, therefore, be eliminated on another trial.

II. The eleventh instruction given by the court is said to be erroneous, because it is thought that the definition of premeditated design therein given is not correct. Our statute defining murder in the first degree as the killing of a human being without the authority of law, "when perpetrated from a premeditated design to effect the death of the person killed or any human being," was originally enacted in this State by chapter 1637, act approved August 6, 1868. See sections 1 and 2 ,of sub-chapter III of that act. In *Savage v. State, supra,* this court was called upon to construe the statute, and, so far as I can ascertain, the construction there placed upon it has been consistently adhered to ever since. In that case the court below refused to give instructions as follows: "In this case the State is required to prove malice, deliberation and premeditation. There should be time and opportunity for deliberate thought, and

after the mind conceives the thought of taking life the conception should be meditated upon and a deliberate determination formed to do the act, but it makes no difference how soon after the fatal resolve is carried into execution."

"In order to justify a verdict of murder in the first degree, it is not enough for the State to show that the defendants, or either of them, during the rencounter in which the fatal wound was given, considered whether he or they would flee from the combat. It must be shown beyond a reasonable doubt that prior to the infliction of the mortal wound a premeditated, formed design existed in the minds of the prisoners to take the life of the deceased, and that sufficient time elapsed between the conception of the design to take life and the infliction of the mortal wound for them to meditate and deliberate upon the act of killing." These instructions were taken almost literally from the decision in *Fahnestock v. State*, 23 Ind. 231, text 263, a case relied upon now as correctly defining premeditated design, but this court repudiated them as unsound; and even in Indiana the decision was not regarded as inconsistent with the view that a prior intention to do the act of which the accused was fully conscious, followed by action in pursuance of that intention, would constitute premeditation. *Binns v. State,* 66 Ind. 428, text 433. In commenting on these refused instructions the court refers approvingly to *People v. Clark,* 7 N. Y. 385, stating that it was decided upon a statute of New York substantially in the language of our statute, and to *Drum's* case, 8 P. F. Smith (58 Pa. St.) 16, and *Jones v. Commonwealth,* 75 Pa. St. 403. The court points out the fact that under the Pennsylvania statute *deliberation* is an essential element; but that under the New York, as well as the Pennsylvania statute, "it is enough that the intention precedes the act, without regard to length of time, if there be time enough to form a design to take life and to put that design into execution." The court then proceeds: "The language of the instructions prayed is not quite sustained

by the authorities. It is that 'there should be time and opportunity for deliberate thought, and after the mind conceives the thought of taking life the conception should be meditated upon, and a deliberate determination formed to do the act.' There are here three stages of mental progress necessary to be established by the State, according to this proposition: the conception of the thought of taking life, meditation upon the conception and thought, and finally deliberate determination after meditation, followed by the execution of the original conception. These mental processes may be metaphysically the correct series necessary for every slayer to experience before being guilty of murder in the first degree, but the law imposes, after all, its penalties if the conception, the intention formed and the act, however closely following each other, are proved to exist and are imbued with malice." In *Irwin v. State,* 19 Fla. 872, the court, following the case of *Savage v. State,* approves a charge by which the jury were told, in effect, that if the deceased was unarmed and making no hostile demonstration, and the accused under these circumstances, armed with a concealed pistol, walked up to the deceased and intending to kill him did then and there kill him by shooting him with the pistol, they should find him guilty of murder in the first degree unless the defendant was insane. In *Ernest v. State,* 20 Fla. 383, the court say: "Premeditation is defined as meaning intent before the act but not necessarily an intent existing any extended time before the act. Premeditated design as used in the statute means an intent to kill, design means intent, and both words imply premeditation." In *Carter v. State,* 22 Fla. 553, the court say: "If there is an intent to kill, an interval of time after it sufficiently long for the prisoner to be fully conscious of what he intends, and then an execution of such intent, it is sufficient to convict the prisoner of murder in the first degree." In *Lovett v. State,* 30 Fla. 142, 11 South. Rep. 550, 17 L. R. A. 705, it was held not erroneous to charge that "the premeditation

which the law requires to constitute murder in the first de-
gree need not be for any particular length of time, but it is
sufficient if the premeditation was but for a moment, pro-
vided that the action of the slayer was the result of pre-
meditation;" that the use of the word moment does not im-
ply less time than was necessary for deliberating upon the
subject of killing and forming a distinct design or determina-
tion to kill, of which the defendant was fully conscious be-
fore firing the fatal shot; that the premeditation or delibera-
tion need not be for any particular length of time, but it,
of course, must be of sufficient duration to enable the slayer,
under the circumstances of each case, to form a distinct and
conscious intent to kill. The court follows the previous
decisions in *Savage v. State* and *Carter v. State,* and the
clear effect of that decision is to hold that if the party forms
a distinct and conscious intention to do the act before he does
it, and then kills in pursuance of such intention, there is
sufficient premeditation to constitute murder in the first de-
gree. Decisions from Alabama, Indiana, Missouri and Cal-
ifornia are there cited to sustain the proposition decided in
that case, which will be referred to later.

The decisions of this court already referred to were all
prior to the revision of 1892, and it may be safely asserted
that the settled construction of the statute at that time
uniformly adhered to was that if the accused prior to the
fatal stroke thought or reflected upon the act of killing
sufficiently to form in his mind a distinct purpose to kill, or
a purpose to kill of which he was fully conscious, and did
kill in pursuance of such purpose, the killing would be from
a premeditated design. The statute was re-enacted in the
revision of 1892, and under well settled rules of construc-
tion the interpretation formerly placed upon the statute was
thereby adopted by the legislature. That the legislature
did not intend a different construction is apparent when we
remember that the Revised Statutes made a change in the
definition of murder in the second degree, in order to change

the interpretation placed upon the original statute in *John-son v. State*, 24 Fla. 162, 4 South. Rep. 535, and many other changes were made in regard to manslaughter, while the definition of murder in the first degree was re-enacted in the same language. And it may be remarked that other provisions of the homicide statute have been amended since that time, in order to change interpretations placed upon the original by this court, but the statutory definition of murder in the first degree has never been altered.

The definition of "premeditated design" seems never to have been directly questioned in this State after the *Lovett* case. It was considered to be definitely and conclusively settled by the decisions to which I have referred, by both bench and bar. However, in the case of *Olds v. State*, 44 Fla. 452, 33 South. Rep. 296, decided last year, the court had occasion to consider charges upon the question of heat of passion as affecting premeditated design, and the definitions of premeditated design as announced in *Ernest v. State*, and *Carter v. State*, were again adopted and approved. It was there distinctly held that premeditation may exist if the slayer is fully conscious of his intention to kill, but it is not necessary that he should be cool and self-possessed. It was further held that an intentional killing may not be murder in the first degree when done in the heat of passion or anger, and following a sufficient provocation so close in time as to raise the presumption that it was the result of sudden impulse and without premeditation, or when committed under such circumstances as to show that the mind was not fully conscious of its own intentions. In *Garner v. State*, 28 Fla. 113, 9 South. Rep. 835, 29 Am. St. Rep. 232, the same principle was applied in cases of drunkenness. It is there said that "if a jury find from the evidence that the defendant was at the time of the killing so much intoxicated as to be incapable of forming a premeditated design, or of deliberating sufficiently to form such a design, to take the life of the deceased or any human being (*Savage v. State*, 18 Fla.

909), and yet that but for this incapacity the defendant would be guilty of murder in the first degree, they can not find him guilty of murder in the first degree, because such premeditation is essential to the offense of murder in the first degree." The court also says that shooting a person intentionally and killing him is not necessarily the same as doing so with a premeditated design to kill him. This proposition is distinctly asserted in the *Savage* and *Irwin* cases, and is clearly correct, for a mere intention to *shoot* another is not the equivalent of an intention *to kill* him. The court also says there may be an intention without its having been premeditated; that the jury may believe that the intoxication was such as to prevent the deliberation necessary to form a premeditated design and yet not believe that it was sufficient to prevent an intentional shooting. It is quite evident that the court in that case did not intend to add anything to the previous definitions of premeditated design, for it refers to the *Savage* case approvingly upon that subject. The court's attention in that case was directed to the question of the capacity of the party to form a premeditated design, but nowhere do we find in that or the *Olds* decision an intimation that an intention to kill, formed before the act, and of which the mind was fully conscious, would not constitute a premeditated design as had uniformly been held in other cases. In truth, the question of drunkenness does not in any sense enter into or change the definition of premeditated design, but like immaturity of years, insanity and the like, goes to the question of *capacity* to form a premeditated design. The definition of premeditated design is the same in all cases, but if the party lacks legal capacity to entertain it, he can not be guilty though every element of the definition be present in the particular case.

At the time our homicide statute was passed only two States had similar ones, *viz*: New York and Wisconsin. Any one who will take the trouble to examine will find that our statute is almost a literal transcript of the one in Wis-

consin, while in many particulars it differs from that in New York. In the matter of premeditated design, however, which we are now considering, the three statutes were the same. Our court, as has been shown, followed the construction of the New York Court of Appeals in the case of *People v. Clark, supra.* The same court, upon the authority of the *Clark* case, reversed the judgment in the case of *Sullivan v. People,* 1 Park. Crim. Rep. 347, relied on here, and the doctrine there announced never obtained in New York under the statute as it was originally enacted. See *People v. Sullivan,* 7 N. Y. 396. The fact that the legislature of New York in 1873, more than twenty years after this decision, amended the statute by requiring a *deliberate and premeditated* design to constitute murder in the first degree, and by creating a new degree of murder for all other intentional killings, should not influence us to place a different construction upon our statute, for our legislature has reenacted ours without adding anything to the definition, showing that it was entirely satisfied with our definition taken from the New York decisions before the statute was amended there. The amendment of the New York statute came more than twenty years after the *Clark* decision, and did not reduce intentional killings to manslaughter. It simply created a new degree of murder, in which was placed all homicides committed with intent to take life, where there was no deliberation and premeditation. *Shufflin v. People,* 62 N. Y. 229, 20 Am. Rep. 483; *People v. Wood,* 126 N. Y. 249, 27 N. E. Rep. 362. In Wisconsin, where the statute is the same as ours, the interpretation of premeditated design has been announced to be the same as the rule we have always followed (*Hogan v. State,* 36 Wis. 226), and is still adhered to there. *Perugi v. State,* 104 Wis. 230, 80 N. W. Rep. 593, 76 Am. St. Rep. 865; *Miller v. State,* 106 Wis. 156, 81 N. W. Rep. 1020. If we take the natural, ordinary meaning of the words premeditated design, the conclusion must be the same. The design must be a premeditated one.

Webster defines meditate and premeditate as follows: "Meditate, intransitive, to keep the mind in a state of contemplation, to dwell on anything in thought, to think seriously, to muse, to cogitate, to reflect." "Meditate, transitive, 1, to contemplate, to keep the mind fixed upon to study; 2, to purpose, to intend, to design, to plan by revolving in the mind." He says further: "We *meditate* a design when we are looking out or waiting for the means of its accomplishment, we *contemplate* it when the means are at hand and our decision is nearly or quite made. To *intend* is stronger, implying that we have decided to act when an opportunity may offer. A general meditates an attack upon the enemy, he *contemplates* or *intends* undertaking it at the earliest convenient season." "Premeditate, transitive, to think on and revolve in the mind beforehand; to contrive and design previously." "Premeditate, intransitive, to think, consider, deliberate, or revolve in the mind beforehand." If, as required by our previous decisions, there be formed in the mind of the accused a distinct purpose or intent to kill, or a purpose to kill of which he was fully conscious, and he in fact acted upon such purpose or intent and killed in pursuance thereof, can it be said that any shade of meaning attached to the words meditate or premeditate as defined by Webster is lacking? Can a court prescribe the length of time the mind must be kept in a state of contemplation or the time it must dwell on the thought of killing, or the time it must think seriously, muse, cogitate or reflect? Can it say how intense the thinking must be? Can it require that two intents to kill be formed, or that the mind must contemplate the deed more than once? Can it say that the mind must be taken off the subject and revert to it again? Can it prescribe the degree of intensity of the musing, the cogitation, the reflection, or say that these mental operations must be interrupted by other thoughts and then reverted to again? The definition does not require that the mental effort be interrupted, nor that it be con-

tinued for any definite length of time, nor do the courts require it. The human mind acts with great quickness. Its operations are evidenced only by certain outward manifestations. What then will satisfy the definition of meditate? Obviously it will be fully met by the formation of a conscious, distinct purpose or design to kill, followed by the execution of such purpose. One who has formed in his mind such a purpose, and who carries it into execution, has necessarily kept his mind in a state of contemplation, he has dwelt on the killing in thought, he has thought seriously, he has mused, cogitated and reflected. The fruit of all these mental processes is a fully formed conscious purpose or intent either to do or not to do the thing in mind; and if the intent so formed be to kill, and the hand in obedience to the will carries it into execution, it can not be said that the act was not premeditated, under any shade of meaning attached to the word. The same is true with respect to the definitions of the transitive verb, and it will be observed that the second definition of that verb is to "purpose, to intend, to design, to plan by revolving in the mind." It is also true with respect to the definitions of the transitive and intransitive verbs "premeditate." If one engages in thought sufficiently to form an intent to do an act of which he is fully conscious, and to carry that intent into execution, can it be said that he has not thought on and revolved in the mind beforehand; that he has not contrived and designed previously; that he has not thought, considered, deliberated or revolved in the mind beforehand? How is it possible to entertain a fully formed, conscious purpose, and to carry that purpose into execution unless the mind has gone through these several processes? As I said before, the fruit of all these mental operations is a fully formed conscious intent to do or not to do, and unless the court is prepared to say that the mind must waver or vacillate between two opinions, or that it must have recurred to, after being diverted from the subject, or that the mental processes must have

been continued for a period of time exceeding that required for the formation and execution of the fully formed, conscious purpose, which no court seems to require, our well established definition is correct and should be adhered to.

The construction which the New York and Wisconsin courts placed upon the original statute was in strict accordance with the intention of the New York revisors who framed the statute, for they stated in their report "that the great principle on which the section (defining murder in the first degree) rests is this: that to constitute murder there should be an *express design* to take life, or such facts occurring in a transaction as would ordinarily lead to the result of taking life." *Hogan v. State, supra,* text 240; *Sullivan v. People,* 1 Parke. Crim. Rep. 347, text 350.

I have been unable to find that any court, except in New York, Wisconsin and Florida, has construed the words "premeditated design" in statutes similar to ours, and as I have shown they all agree that nothing more than a fully formed, conscious purpose to kill, followed by action thereon, is required. In other States, where the statutes are modelled upon the Pennsylvania statute, and require a "wilful, deliberate and premeditated killing" in order to constitute murder in the first degree, the word "premeditated" has frequently been interpreted. In Missouri it is defined as meaning "thought of beforehand for any length of time however short." *State v. Harris,* 76 Mo. 361; *State v. Wieners,* 66 Mo. 13, text 25. It is also said in *State v. Ellis,* 74 Mo. 207, that the word does not mean *thought over* because that gives to premeditation an element of deliberation which does not belong to it. In *Milton v. State,* 6 Neb. 136, it is defined as "to think on, to revolve in the mind beforehand, to contrive and design previously." In *Dale v. State,* 10 Yerg. (Tenn.) 550, it is said that an act is done with premeditation when a design is formed to do the act before the act is performed. In *State v. Ah Lee,* 8 Oregon 214, it is said "premeditation is where the intention

to do the act has been formed before the attempt to execute it." In California it is said, referring to the words "wilful, deliberate and premeditated," "it needs no argument to show that these several words, abstractly and separately considered, are not synonymous." *People v. Pool,* 27 Cal. 573, text 584. In construing our statute it should not be forgotten that the words "wilful" and "deliberate" are not to be found in its definition of murder in the first degree, nor is the word "premeditated" associated with other words implying a great degree of determination and self-possession, as is the case with most of the statutes in this country which define murder in the first degree as "murder committed by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing," which greatly influence the construction. *Craft v. State,* 3 Kan. 450; *State v. Greenleaf,* 71 N. H. 606, 54 Atl. Rep. 38. In these States where the words "wilful, deliberate and premeditated" are used many cases sustain the view that the killing will be wilful, deliberate and premeditated in all cases where an intent to kill exists before the act, of which intent the mind is fully conscious, and the accused thereafter executes the intent by killing, without regard to the length of time intervening the intent and the act. *State v. Beatty,* 51 West Va. 232, text 244, 41 S. E. Rep. 434; *McAdams v. State,* 25 Ark. 405, text 414; *Whiteford v. Commonwealth,* 6 Rand. (Va.) 721, 18 Am. Dec. 771; *Donnelly v. State,* 26 N. J. L. 463, text 510; *State v. Dowden,* 118 N. C. 1145, text 1153, 24 S. E. Rep. 722; *Hawthorne v. State,* 58 Miss. 778; *Daughdrill v. State,* 113 Ala. 7, 21 South. Rep. 378. The decision in this last cited case is strictly in line with the decision in *Cleveland v. State,* 86 Ala. 1, 5 South. Rep. 426, opinion by Judge STONE, in which he refers to the previous decisions of the same court in *Mitchell v. State,* 60 Ala. 26, and *Smith v. State,* 68 Ala. 424, opinions written by him as sustaining the proposition that "if a person had time to think and did think, and after having thought struck

the blow as the result of a determination produced by the operation of the mind that would be sufficient deliberation and premeditation." Many other cases might be cited in this connection, but I will content myself with referring to the rule under such statutes, deduced by the most eminent American text writers upon criminal law, and to the fact that the Supreme Court of the United States approve the decision in the New York case of *People v. Clark,* upon which the former decisions of this court rest. *Allen v. United States,* 164, U. S. 492, 17 Sup. Ct. Rep. 154; Wharton on Homicide, sec. 180; 2 Bishop's New Crim. Law, sec. 728-2. Mr. Bishop's view supports the rule I contend for. He says that there may be a killing which will be manslaughter though prompted by an intent to take life, and in a part of the States, but not all, there may be a killing with intent to take life which will be murder in the second degree, "but except in the classes of cases thus disclosed wherein the intent comes through a cloud of passion or otherwise deliberate premeditation is excluded, or where the killing is done through a belief of its necessity in self-defense, or the like, the doctrine to which the courts in most of the States have arrived is that the intent to take life is the distinguishing feature of murder in the first degree under the clause now in contemplation, so that if that exist the murder is in this degree and in the second where it does not exist." Every State from which authorities are cited to sustain the proposition that our definition of premeditated design is unsound, has the word deliberate in its statute defining murder in the first degree, and most of them have the word "wilful" preceded by the words "poison, lying in wait," etc.

Reverting again to the New York doctrine, we find that in 1873 the statute had been amended by inserting the word "deliberate" in the definition of murder in the first degree, and by a further provision that "such killing unless it be murder in the first degree or manslaughter, or ex-

cusable or justifiable homicide as hereinafter provided shall be murder in the second degree, when perpetrated *intentionally,* but *without deliberation and premeditation." Buel v. People,* 78 N. Y. 493, 34 Am. Rep. 555. The statute itself drew a distinction between a *deliberate* and *premeditated* killing and an *intentional* one, and of course the court was required to do the same as it was clear that by the words "deliberate and premeditated" the legislature meant something more than intentional, so that though every unlawful *intentional* killing remained murder after the statute was *amended, an intentional killing* without deliberation and premeditation was only murder in the second degree. *Shufflin v. People,* 62 N. Y. 229, 20 Am. Rep. 483; *People v. Wood,* 126 N. Y. 249, 27 N. E. Rep. 362. The statute in Minnesota also draws a somewhat similar distinction. *State v. Hoyt,* 13 Minn. 132. The latter decisions in New York are all based upon the statute as amended. Under them it was held in *People v. Majone,* 91 N. Y. 211, that there must be not only an intention, but a deliberate and premeditated design to kill which must precede the killing by *some* appreciable space of time, but that it need not be long; that if it is sufficient *for some* reflection and consideration upon the matter, for *choice to kill or not to kill* and for the formation of a *definite purpose* to kill, the demands of the law are satisfied. In *People v. Conroy,* 97 N. Y. 62, the court say: "The intention to commit a homicide which is not formed under the impulse of immediate provocation or a sudden and instinctive apprehension of danger from some apparent cause would seem to involve, to a certain extent, both deliberation and premeditation." The court quote approvingly from the opinion in *People v. Clark,* 7 N. Y. 393 (the case decided prior to the amendment of the statute), as follows: "If there be sufficient deliberation to form a design to take life and to put that design into execution by destroying life there is sufficient deliberation to constitute murder  *  *  *  it is enough that the inten-

tion precedes that act, although that follows immediately."
The entire opinion in that case is very instructive on this
question. In *People v. Constantino*, 153 N. Y. 24, 47 N. E.
Rep. 37, the doctrine of the previous cases is merely re-
affirmed. In none of them is there a suggestion that a fully
formed conscious purpose to kill, followed by action upon
that purpose, would be less than a deliberate and premed-
itated design to kill.

In *Lovett v. State*, 30 Fla. 142, 11 South. Rep. 550, 17
L. R. A. 705, the court following the previous decisions held
that the act of killing must be the result of premeditation
upon that issue, *i. e.*, that there must have been, previous
to the act of killing, deliberation by the slayer upon the ques-
tion of killing the deceased resulting in a distinct determina-
tion or well formed design to kill him and that such determi-
nation or design to kill must be carried out or executed in
the act of killing; but that all this might occur in a *moment*.
In addition to the Florida cases the court cites *State v.
Weiners*, 66 Mo. 13; *State v. Harris*, 76 Mo. 361; *Binns v.
State*, 66 Ind. 428; *People v. Foren*, 25 Cal. 361;
*People v. Pool*, 27 Cal. 573; *Lang v. State*, 84 Ala. 1, 4
South. Rep. 193, 5 Am. St. Rep. 324; *Seams v. State*,
*ibid.* 410, 4 South. Rep. 521, and a reference to
these cases will show clearly what was in the mind of the
court. In the Missouri cases and the first one cited from
Alabama, the word premeditated is defined as meaning
"thought of beforehand, even for a moment," "thought of
beforehand for any length of time however short," "de-
termining on the killing beforehand." The Alabama cases
also hold that if the "formed design" existed in the mind
of the defendant but for one moment before the homicide
it would be sufficient, and that if reflected and determined
on before the killing, however brief may be the period, the
law concludes a formed design. In the Indiana case it was
held that premeditation involves a prior determination to
do the act in question; that it is not necessary that this in-

tention should have been conceived for any particular period of time; that it is as much premeditation, if it entered into the mind of the guilty agent a moment before the act as if it entered ten years before. In that case an instruction that "premeditated malice is where the intention to unlawfully take life is deliberately formed in the mind and that determination meditated upon before the fatal stroke is given. There need be no appreciable space of time between the formation of the intention to kill and the killing. They may be as instantaneous as successive thoughts. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation, on the part of the slayer" was held to be correct. This decision was under a statute requiring murder in the first degree to be done "purposely and with premeditated malice." In the first California case the court held that if the defendant resolved before the homicide was committed to kill and murder the deceased he was guilty of murder in the first degree; that a resolve implies deliberation and that resolving to kill and murder a human being, falls directly among the descriptive elements constituting murder in the first degree. This was decided under a statute requiring the killing to be "wilful, deliberate and premeditated" in order to constitute murder in the first degree. In the other California case, the court defines wilful, deliberate and premeditated, showing the different meanings each legitimately possesses, but holds that under the particular wording of their statute, the legislature intended each to have the same meaning as the others, and that the idea of all is embraced in the term *wilful*. The court say: "There is a 'wilful killing' within the meaning of the statute whenever there is simply a specific intent, a design or purpose formed to take life; that there is a 'deliberate killing' whenever such intent or purpose is formed upon deliberation or consideration, and the deliberation or consideration need not be for any particular period of time —a moment is as effectual as an hour or a day—and there

is a 'premeditated killing' wherever the deliberation or con-
sideration precedes the purpose formed and as before stated
with respect to deliberation, it need not precede the purpose
formed for any particular period of time."  *  *  *  Com-
pare these well established legal definitions of the several
phrases in question and see if each does not necessarily
imply all of the others.  As to the phrase "wilful killing"
there seems to be no room for doubt.  How is it possible
for the mind to perform the operation of willing—of de-
termining an act—of forming a purpose, without a pre-
consideration of the question.  If A determines to go to
San Francisco he must necessarily have thought upon the
subject, "considered the question before he determined to
go."  The effect of the decision is to hold that a killing is
"wilful, deliberate and premeditated" if it occurred in pur-
suance of a distinct and conscious purpose formed in the
mind prior to the act, and fully sustains our previous de-
cisions in this State to that effect.

The argument by which the charge given by the circuit
judge in this case is sought to be condemned seems to rest
upon the assumption that the true distinction between mur-
der and voluntary manslaughter is to be found in the nature
of the intent to take life, which intent is common to both,
and that a fully formed conscious intent to kill will make
the crime manslaughter only, while to constitute murder in
the first degree something more than a fully formed con-
scious purpose must exist.  The idea seems to be that as a
conscious intent to take life exists in murder in the first de-
gree as well as in voluntary manslaughter, the court must
add to such intent something more than mere premeditation
or "thought of beforehand" in order to distinguish between
these two degrees of homicide.  The defect in the argument
lies in this assumption.  While an intent to take life exists in
both degrees of homicide, in the one it proceeds from malice,
while in the other it is formed suddenly under the influence
of violent passion which for the instant overwhelms the

reason and causes the party to act from passion rather than judgment. 21 Am. & Eng. Ency. Law, pp. 172, 173. This idea is forcibly expressed by Judge RANDALL in *Savage v. State, supra,* where in speaking of premeditated design, he says: "But the law imposes after all its penalties if the conception, the intention formed and the act, however closely following each other, are proved to exist and are imbued with malice." If the intent to kill is imbued with or proceeds from malice, then the offense is murder in the first degree; if it proceeds from passion induced by adequate provocation, and not from malice, it is manslaughter. This is the true test, and no other can be safely substituted for it. *Roberson v. State,* 42 Fla. 223, 28 South. Rep. 424; *idem,* 43 Fla. 156, 29 South. Rep. 535, 52 L. R. A. 751; *idem,* 45 Fla. 94, 34 South. Rep. 294. Any other test would authorize a conviction for murder in the first degree of one who in the heat of passion, caused by adequate provocation, formed an intent, designed a plan, meditated upon the intent and the plan, and then executed it, all before the passion had time to cool. It would also require a conviction of manslaughter only, of one who, having no ill-will toward another upon meeting him, should suddenly out of mere wantonness, or for a very slight insult, form and execute immediately a design to kill him, because in such a case there would be no *premeditated* design to take life.

To further illustrate my contention take the supposed cases mentioned in the opinion prepared by Mr. Justice HOCKER, and subject them to the test of the definition of deliberate and premeditated design which he adopts from the New York decision of *People v. Decker,* which merely re-affirms the definition given in *People v. Majone,* and let us see what the result will be. A man in the heat of passion produced by great provocation, or an officer in arresting a fléeing felon in the excitement of pursuit, might form a premeditated design to kill; that is a design which precedes the killing by an appreciable space of time—but not

long, still sufficient for some reflection or consideration upon the matter for the choice to kill or not to kill, and for the formation of a definite purpose to kill. These several mental operations might occupy but one or two moments' time, yet the party would be guilty of murder in the first degree under the definition approved, though the present effort is to so frame the definition as to exclude such cases. The truth is we can not frame a definition of premeditated design that will exclude such cases, unless we say that a definite period of time must intervene the intent and the act, as for instance that the intent must have been formed on a prior occasion, but it is not proposed that we adopt such a definition. I am not prepared to say that the officer in the case supposed by Mr. Justice HOCKER would not be guilty of murder in the first degree if the killing was unlawful, but the party who formed and executed the intent to kill in the heat of passion would be guilty of manslaughter only, because the law would conclusively presume that the intent formed was free from malice.

The charges criticised in the present case are sustained by our previous decisions, and I do not understand that this fact is seriously questioned. In order to hold them erroneous we must overrule the uniform decisions of this court for nearly a quarter of a century construing "premeditated design" and disregard the rule of construction appertaining to re-enacted statutes. We must disregard and declare to be erroneous the decisions rendered in the only States that have statutes like ours. We must interpret into our statutes the words "wilful and deliberate," which to my mind is judicial legislation pure and simple, and depart from our conservatism by disregarding and setting at naught our own decisions as well as the weight of authority in States where those words are made by statute a part of the definition, for by the great weight of authority there the charges under consideration are correct. I am unwilling to assume this

responsibility, and thereby unsettle the law of homicide in this State as understood for nearly a quarter of a century.

The court being equally divided in opinion, the question of the propriety of the charges herein considered remains undecided, but other errors found require reversal of the judgment.

Upon all other questions discussed by Mr. Justice HOCKER I concur in the opinion prepared by him.

MAXWELL, J. (dissenting).—I concur in the view of Mr. Justice CARTER that the charge as to premeditated design given by the judge below is not reversible error. The charge as a whole was obviously directed to the length of time and degree of deliberation necessary to a premeditated design and upon this point its doctrine is sustained by ample authority both of this and other courts. And as applied to this particular case, where incapacity for the formation of such a design because of drunkenness is the defense made, I have no criticism to make of it as a complete definition of what will constitute such a design. And in the case of a killing in cold blood I think it, in the light of our previous decisions, a sufficient definition of the term.

In view of the scope of the discussion in the other opinions filed, which seem to aim at a definition sufficient and accurate in all cases, it may be well that I should say that in my judgment such a definition should contain a qualification that the design to be premeditated must be one not formed and acted upon in the heat of passion. Both of the other opinions filed, as well as the previous decisions of this court (*Williams v. State,* 41 Fla. 295, 26 South. Rep. 184; *Olds v. State,* 44 Fla. 452, 33 South. Rep. 296), recognized that a design to take life may be fully and consciously formed by the party before acting upon it, and yet that if this is done in the heat of passion the slayer is guilty only of manslaughter. Yet without the qualification which I suggest, such an act would come within the definition

given of murder in the first degree as there is the fully formed conscious purpose to kill preceding and inducing the act of killing. This shows such a definition of premeditated design to be too broad to be entirely accurate in all cases, and the discrepancy can not be explained by saying that the definition is accurate but the heat of passion goes to the capacity of the party to form a premeditated design. To say that the party has capacity for a fully formed conscious purpose before the act, but no capacity for a premeditated design, is to admit that the one is not the equivalent of the other. I think, therefore, that in a case where the evidence tends to show a killing in the heat of passion the charge as given here, if without qualification anywhere as to the effect in law of the heat of passion in reducing the crime, would be misleading and tend to bring about a verdict for murder when the evidence showed only manslaughter.

I do not mean to imply that even in such a case it will be error not to incorporate this qualification in that part of the charge defining murder in the first degree. The usual form of instruction in our courts is to define murder in the first degree substantially as done in this case, and in cases calling for it in charging upon manslaughter to add the qualifying instruction that a killing, even though intentional, which is designed and executed in the heat of passion, is manslaughter only, and such a charge taken as a whole will give the jury a correct interpretation of the law.

Upon the other assignments of error I concur in the opinion of Mr. Justice Hocker.

CockRELL, J.—Believing, as I do, that the definition of a premeditated design so long followed in this State is not only sustainable on principle but is taken from the decisions of those States that have or had the same statutory definition of murder that obtains here, and that this definition was enacted into the statute by the re-enactment of the

statute, I am of the opinion that no error was committed by the court below in giving the eleventh charge, nor any reversible error in giving the tenth charge.

In other respects I concur in the opinion of Mr. Justice HOCKER.