J. BARNEY STOKES and G. LEE STOKES, *Plaintiffs in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

1. No error is made to appear in the court's overruling a challenge of a talesman for cause, when the bill of exceptions does not show that the defendants challenged the proposed juror peremptorily, and it is made affirmatively to appear that the proposed juror did not sit on the jury.

2. In a trial for murder in the first degree, the trial judge gave the following charge to the jury: "I now define to you murder in the first degree: The unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed, or any human being, or when committed in the perpetration of, or in the attempt to perpetrate any arson, rape, robbery or burglary, is murder in the first degree. Premeditation is defined as meaning intent before the act, but not necessarily an intent existing any extended time before the act. Premeditated design to kill means an intent to kill; design means intent, and both words imply premeditation. The premeditation need not be for any particular length of time, but it, of course, must be of sufficient duration to enable the slayer, under the circumstances of each case, to form a distinct and conscious intent to kill."

In the opinion of Taylor, P. J. and Hocker, and Parkhill, J. J. this charge is erroneous and misleading as a definition of murder in the first degree. Shackleford, C. J. and Cockrell, and Whitfield, J. J. not concurring, the question presented by this charge is not decided.

3. The above instruction does not contain two distinct propositions, and is not subject to the well settled rule that where the charge of the court to the jury embraces several distinct

propositions, a single general exception to the charge as given is not available, if any one of the propositions is correct.

4. In a prosecution for murder, a charge that, "On the question of intent on the part of the defendants and the purpose of their prior engagement to meet and settle the difficulties, whether to be done peaceably or otherwise, you are to consider their prior conduct, and if they armed themselves with deadly weapons before their going, the purpose and object of their arming themselves," is erroneous, as assuming to be true a fact not clearly admitted by defendants.

5. In a prosecution for murder, a charge is erroneous and misleading when it submits to the jury the question of the existence of bad blood between the families of the deceased and the defendants, when there is no evidence of the existence of bad blood between the families of the deceased and either of the defendants.

6. In a prosecution for murder a charge is erroneous and misleading when it excludes consideration by the jury of facts in evidence tending to explain the presence of defendants charged as accessories at the scene of the homicide, and explanations given by them for being armed with deadly weapons.

This case was decided by Division B.

Writ of Error to the Circuit Court for Citrus County.

The facts in the case are stated in the opinion of the court.

*Thomas Palmer* and *T. P. Lloyd,* for plaintiffs in error;

*W. H. Ellis,* Attorney General, and *Ed. W. Davis,* State Attorney for the Fifth Judicial Circuit, for the state.

PARKHILL, J.—The plaintiffs in error, J. Barney

Stokes and G. Lee Stokes, together with Tom Stokes, were jointly indicted in the circuit court for Citrus county for murder in the first degree of one Watt Zelner. The indictment charged G. Lee Stokes with inflicting the mortal wound which caused the death of Zelner, by shooting him with a shot gun. J. Barney and Tom Stokes are charged in the indictment with being "present, unlawfully and from a premeditated design to effect the death of the said Watt Zelner, aiding, abetting, assisting, counseling and advising the said G. Lee Stokes the murder aforesaid in manner and form aforesaid to do and commit." The plea of the said defendants was not guilty. On the 12th day of November, 1906, a trial was had. The jury returned a verdict of murder in the first degree as to J. Barney Stokes and G. Lee Stokes, with a recommendation of mercy. Tom Stokes was convicted of murder in the third degree. From the judgment and sentence of life imprisonment imposed upon them, J. Barney Stokes and G. Lee Stokes have sued out a writ of error, returnable to the present term of this court.

There are twenty assignments of error. All of them are expressly abandoned or waived by not being argued, except the 1st, 7th, 8th, 12th, 14th and 15th.

I. We will consider now the first assignment of error: "the ruling of the court in refusing to sustain, and in overruling the challenge for cause made by the plaintiff in error; G. Lee Stokes, to L. Thompson tendered as a juror in said cause."

It is insisted here that the talesman, Thompson, having formed an opinion as to the guilt or innocence of the defendants from information derived from a witness for the state, was incompetent as a juror. Upon being examined on his voir dire, the venireman, Thompson, was challenged for cause by the defendants. The court overruled the challenge, to which ruling the defendants

excepted.    The bill of exceptions does not show that either of the defendants challenged the proposed juror peremptorily.    It does affirmatively appear that Thompson did not sit on the jury.    It does not appear how this was brought about.    It appears that upon the impaneling of the jury the defendants G. Lee Stokes and J. Barney Stokes exhausted their peremptory challenges, but it does not appear that any one of these challenges was used in getting rid of Thompson.    It does not appear that Tom Stokes exhausted the peremptory challenges to which he was entitled.    It is not made to appear to us that in getting rid of Thompson any right of any one of the defendants was abridged.    For all that appears by the record, the court, of its own motion later on, may have caused Thompson to stand aside, or the state may have challenged him peremptorily afterwards, or he may have been challenged peremptorily by the defendant Tom Stokes.    Be that as it may, under the showing made here, we are of the opinion that, since Thompson did not sit on the jury, no harm was done to defendants J. Barney or G. Lee Stokes.    Burt v. Panjaud, 99 U. S. 180, 25 L. Ed. 451.    So, whether the court erred or not in overruling the challenge for cause, this assignment must fail.

The seventh and eighth assignments of error are argued together, in the endeavor to show that the verdict is contrary to the evidence.    As this case must be reversed upon other grounds, we will not discuss the sufficiency of the evidence.

II.    The twelfth assignment of error questions the correctness of the following instruction, No. 3, given by the court upon its own motion:    "I now define to you murder in the first degree:    The unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed, or any human being, or when committed in the perpetration of, or

in the attempt to perpetrate any arson, rape, robbery or burglary, is murder in the first degree. Premeditation is defined as meaning intent before the act, but not necessarily an intent existing any extended time before the act. Premeditated design to kill means an intent to kill; design means intent, and both words imply premeditation. The premeditation need not be for any particular length of time, but it, of course, must be of sufficient duration to enable the slayer, under the circumstances of each case, to form a distinct and conscious intent to kill." To the giving of this charge by the court, the defendants then and there excepted. The defendants also excepted to the giving of this charge by incorporating the same in their motion for a new trial. The attorney general contends that this assignment cannot be considered, because "there was an exception to the entire charge, which embraced two propositions."

In McCoggle v. State, 41 Fla. 525, the court said: "Referring to the record for the charges thus excepted to, we find the single general exception thus made embraces six several instructions upon different propositions of law. The well settled rule here is that where the charge of the court to the jury embraces several distinct propositions, a single general exception to the charge as given is not available, if any one of the propositions is correct." The charge given by the court to the jury in the instant case embraced twenty-three several instructions, containing as many distinct propositions. The defendants, however, did not except generally to the giving of several of these instructions, embracing distinct propositions. Their exception was specific to the giving of instruction number three, which embraces only one proposition. Certainly this instruction does not contain *two distinct* propositions. It defines murder in the first degree. That part of the charge

defining premeditation is not a proposition distinct from a definition of murder in the first degree. It is explanatory of the term premeditated design as used in the first sentence of the instruction. The sentences of the instruction all deal with, explain and relate to the definition of murder in the first degree. The trial court announced the one proposition involved in the instruction when he said: "I now define to you murder in the first degree." The defendants saved their exception to the giving of this instruction, and we think the court erred in the giving of this instruction. We do not propose to enter upon an extended discussion of this question, or to give at any length our reasons for the conclusion stated. This question has been considered fully and discussed at length in the cases of Cook v. State, 46 Fla. 20, 35 South. Rep. 665, and Keigans v. State, 52 Fla. 57, 41 South. Rep. 886. We think the vice of this instruction lies in the statement: "Premeditation is defined as meaning intent before the act, but not necessarily an intent existing any extended time before the act. Premeditated design to kill means an intent to kill; design means intent, and both words imply premeditation." It is true this language is used by this court in Ernest v. State, 20 Fla. 383. We think design means intent. If so, then premeditated design must mean premeditated intent, and premeditated design to kill does not mean an intent to kill. And so this court said, all the justices concurring. in Cook v. State, 46 Fla. 20, 35 South. Rep. 665: "There may in contemplation of law, be an intention to kill a human being, which may not amount to a premeditated design to kill. Shooting a man intentionally, and killing him, is not necessarily the same as doing so with a premeditated design to kill. There may be an intention to kill, without its having been premeditated."

This doctrine, however, did not originate with the

Cook case; but it is clearly stated by Chief Justice Raney, in the case of Garner v. State, 28 Fla. 113, text 157, 9 South. Rep. 835, where he said: "It is true that a person who is sober enough to form the intention to shoot, and does shoot and kill another, without excuse or justification is criminally liable according as the law defines the offense and fixes the liability, but the shooting a person intentionally and killing him is not necessarily the same as doing so with a premeditated design to kill him. There may be intention without its having been premeditated; (State vs. Johnson, 41 Conn. 585; Keenan vs. Commonwealth, 44 Penn. St. 45; Kelly vs. State, 3 Smedes & M., 518; Roberts v. People, 19 Mich. 401;) and the fact that the evidence may satisfy the *jury* that a person is sober enough to form the intention to shoot, may not satisfy them that he was sober enough to form a premeditated design to kill."

The word "premeditated" must have been put in the statute for a purpose. It is not a meaningless term. If the legislature intended to make the unlawful killing of a human being when perpetrated with merely an intent to kill, murder in the first degree, the legislature could have done so by simply so saying. But the legislature did not so declare. The law enacted declares that the unlawful killing of a human being when perpetrated from a *premeditated design* to effect death is murder in the first degree. As shooting a man intentionally and killing him is not the same as doing so from a premeditated design to kill, as there may be an intention to kill, without its having been premeditated, it is clear that under our statute, the unlawful killing of a human being when perpetrated simply *with an intent* to effect death is not the same as the unlawful killing, perpetrated from a *premeditated design* to effect death, and is not murder in the first degree. We are of the opinion, therefore, that this instruction is misleading

and erroneous when it says "Premeditated design to kill means an intent to kill, design means intent, and both words imply premeditation," and that this language makes the whole charge misleading and erroneous; for, since the court, in this part of the instruction, told the jury that "premeditated design to kill means an intent to kill," and that "design means intent and both words imply premeditation," the jury was warranted, to the injury of the defendant, in giving this erroneous meaning to the words "premeditation" and "premeditated design" wherever they occur in other parts of the instruction. And so, in effect, the court instructed the jury that the unlawful killing of a human being when perpetrated with merely an intent to kill is murder in the first degree. And so the court set up a false standard by which the guilt of the defendants was to be measured. And so the court prescribed an insufficient measure of proof of defendants guilt, permitting the defendants to be convicted of murder in the first degree upon proof of an *intent* on their part to kill, when they may, under the law, be convicted of said crime only upon proof of a *premeditated design* to kill. The last sentence of the charge did not cure the error in the other sentences of the charge, for there, too, the jury were instructed, to the injury of the defendants, that the word "premeditation" meant an intent to kill, by the definition already given.

We think, too, that instead of saying the time for premeditation "must be of sufficient duration to enable the slayer, under the circumstances of each case, to form a distinct and conscious intent to kill," it would be better to say: "The premeditation need not be for any particular length of time, but it must be of sufficient duration to enable the slayer, under the circumstances of each case, to form a premeditated design—an intention formed upon premeditation. And so this court said,

in Cook v. State, *supra,* text 33, all the justices concurring: "In order to convict the defendant of murder in the first degree, the jury must be satisfied from the evidence beyond a reasonable doubt, that the defendant, not only had an intention to kill the deceased, but that he actually had a premeditated design to kill him." A person must have a distinct and conscious intent to kill to be guilty of manslaughter; and if a person has no conscious intent to kill, he is not even guilty of manslaughter, in a case where an intent to kill is required. As we have seen, premeditated design is more than an intent to kill. The legislature has made a great difference in the essential elements constituting the crime of murder in the first degree and manslaughter, and prescribed a much severer penalty in the one case than in the other. The courts should not lose sight of the distinction thus made therein. The court in charging the jury, should clearly preserve the difference existing in the elements of these crimes, and clearly inform the jury of the difference between murder in the first degree and manslaughter. The term "premeditated design" should not be used as equivalent to, or interchangeably with, the term "an intent to kill." The one does not mean the other, and the courts ought to tell the jury so, in order that the jury may be able to know and say from the evidence whether a defendant is guilty of murder in the first degree or manslaughter, instead of finding a man guilty of murder in the first degree and recommending him to the mercy of the court, when perhaps they don't know the difference between murder in the first degree and manslaughter.

The trial court gave no other instructions that cured or rectified the error made in the instruction number three. No other instruction, given by the court, defined the meaning of premeditated design. In another instruction, the court told the jury that if the jury find

from the evidence in this case that the charge against the defendants is true, then it will be the duty of the jury to find the defendants guilty. In another instruction the court charged the jury: "If the jury believe from the evidence that the defendant G. L. Stokes at the time and place named in the indictment did unlawfully kill Watt Zelner from a premeditated design to effect the death of Watt Zelner by shooting, as alleged in the indictment, and that at the time J. Barney Stokes and Tom Stokes were present, unlawfully and from a premeditated design to effect the death of Watt Zelner, aiding, abetting, assisting, counseling and advising the said G. Lee Stokes the murder aforesaid to do and commit, then you should find all of the defendants guilty of murder in the first degree." These other instructions did not in any way whatever cure or rectify the erroneous definition of murder in the first degree, as given by the court in the instruction number three. These other instructions, of course, simply repeated in another form the declaration made in the first sentence of the instruction number three, to the effect that the killing of a human being when perpetrated from a premeditated design to effect the death of the person killed is murder in the first degree. So that later on, when the jury is told that, if the charge against the defendants is true, or that, if the defendants unlawfully killed Zelner from a premeditated design to kill Zelner, they must be found guilty of murder in the first degree, the jury is left to understand that "premeditated design to kill means an intent to kill." And so the trial court permitted the defendants to be convicted of murder in the first degree, upon proof of *an intent* on their part to kill Watt Zelner.

It is not our intention to express any opinion as to whether the defendants should have been convicted of either murder or manslaughter, or whether they should

have been convicted at all. We purposely do not express any such opinion because the case must be submitted to another jury. But we are of opinion that the evidence in the case was of such a character as made it proper and necessary to a correct administration of the law, that the court should have made in its charges a clear discrimination between what constitutes murder, and what constitutes manslaughter. The court erred in giving this instruction number three.

III. The fourteenth assignment is based upon the giving of the following instruction, marked No. 9: "On the question of intent on the part of the defendants, and the purpose of their prior engagement to meet and settle the difficulties, whether to be done peaceably or otherwise, you are to consider their prior conduct, and if they armed themselves with deadly weapons before their going, the purpose and object of their arming themselves. You can determine a man's intent from his conduct, his declarations, condition of his mind, the state of feeling existing at the time." To the giving of this instruction, the defendants then and there excepted.

This charge assumes, as an admitted fact in evidence, that *all* the defendants had a prior engagement to meet and settle the difficulties, and informs the jury that on the question of intent on the part of the defendants, and the purpose of their prior engagement to meet and settle the difficulties, whether to be done peaceably or otherwise, the jury may consider the prior conduct of the defendants, etc. J. Barney Stokes admitted that he had an engagement to meet Eldridge Morris at Floral City to settle a difficulty with him. While Tom Stokes admitted that he went to Floral City with his brother, Barney, and knew of Barney's purpose in going to Floral City, it is not admitted that Tom had an engagement to meet Morris or anybody else to settle a difficulty. Tom Stokes testified that he asked Dan Baker to try and make

a settlement between Barney and Eldridge Morris of their difficulties, and to this end arranged the meeting to take place in Floral City to settle this difficulty. It does not seem to be admitted that Tom Stokes had a prior engagement to meet and settle the difficulties. It does not seem to be admitted that G. Lee Stokes had a prior engagement to meet and settle the difficulties. He was in Floral City with his brother Barney and doubtless knew of Barney's prior engagement to meet Morris there. But the language of the charge involves all the defendants in "a prior engagement to meet and settle the difficulties," and assumes this fact as proven, when it was doubtless very harmful to the defendants G. Lee Stokes and Tom Stokes to have it stated as a fact by the court, in view of what occurred after they went to Floral City, that they went to Floral City by prior engagement to settle difficulties, and that the jury could consider, on the question of their intent and the purpose of their prior engagement, the prior conduct, etc. We think the charge was prejudicial to G. Lee Stokes who is here on writ of error and that the court erred in giving this charge.

IV.    The fifteenth assignment of error is based upon the giving of the tenth instruction to the jury, as follows: "If you find from the evidence that G. Lee Stokes and Tom Stokes knew of the prior engagement of J. Barney Stokes to go to Floral City and such prior difficulties with Eldridge Morris and that they armed themselves with deadly weapons, and accompanied their brother to Floral City and seeing a personal difficulty between the deceased and J. Barney Stokes, and that there had been bad blood existing between the families of the deceased and the Stokeses, and upon a difficulty between Watt Zelner and J. Barney Stokes, that G. Lee Stokes and Tom Stokes went to the aid of J. Barney Stokes with loaded guns, with the premeditated design to kill Watt

Zelner, and either one did, in pursuance of said design, kill the said Watt Zelner and the other was unlawfully present aiding, abetting, assisting, counseling and advising such killing from a premeditated design to effect the death of the said Watt Zelner, then you should find G. Lee Stokes and Tom Stokes guilty of murder in the first degree." The giving of this charge was excepted to then and there by the defendants.

This charge is erroneous in that-it submitted to the jury the question of the existence of bad blood between the families of the deceased and the Stokeses—all of them—when there was no evidence of the existence of bad blood between the *families* of the deceased and either of the defendants. It is true the evidence tends to show that bad blood existed between Barney Stokes and Zelner, but not between his family and the deceased.

We think that part of the charge, to the effect that, if G. Lee Stokes and Tom Stokes knew of Barney's prior engagement to go to Floral City to settle difficulties with Morris and that they armed themselves with deadly weapons and accompanied their brother, was calculated to mislead the jury. The charge did not include the consideration by the jury of facts in evidence tending to explain the presence of the defendants G. Lee Stokes and Tom Stokes at Floral City and the explanations given by them for being armed with deadly weapons. The jury had a right to consider the whole evidence upon these points. If Eldridge Morris had been killed by the defendants, the jury might have given great weight to the evidence showing that the defendants, Lee and Tom, were in Floral City with their brother armed with deadly weapons, but said defendants ought to have the right of explaining, if they could do so, that their going armed to Floral City with their brother had no reference to Zelner, and the jury ought to be permitted at least to consider whether the killing of Zelner occurred

upon a sudden provocation independently and apart from their preparations to meet Morris, or was the result of their knowledge that Zelner was coming to the meeting place with Morris, if that was the case. That part of the charge beginning with the words "upon a difficulty between Watt Zelner and J. Barney Stokes, that G. Lee Stokes and Tom Stokes went to the aid of J. Barney Stokes," etc., is not subject to the objection that it excluded the right of Lee and Tom Stokes under certain circumstances to go to the aid of their brother, because the court gave a charge sufficiently covering that phase of the case.

For the errors found the judgment is reversed.

TAYLOR and HOCKER, JJ., concur.

WHITFIELD, J., (concurring in part.)—In a prosecution for murder in the first degree alleged to have been committed from a premeditated design to effect the death of the person killed, where no conflicting or misleading specific instructions are given to the jury by the court, a charge is not erroneous which taken as a whole in effect instructs the jury that if from the facts and circumstances in evidence they believe beyond a reasonable doubt that the defendant unlawfully killed the person alleged to have been killed, and that such unlawful killing. was done by the defendant from a premeditated design to effect the death of the person killed, they should find the defendant guilty of murder in the first degree. But in such a prosecution a charge that taken as a whole in effect instructs the jury that they may find a verdict of murder in the first degree for an unlawful killing of a human being done from only a mere intent to kill the person killed, is erroneous; and if a verdict of murder in the first degree is rendered under such a

charge, a new trial should be granted, unless it clearly appears from a consideration of the entire evidence that no other verdict could legally have been rendered, in which case no possible injury could have resulted to the defendant, and the charge would be harmless error.

In a criminal prosecution where a premeditated design is an essential element of the offense, it is not ordinarily, in the absence of a proper request, incumbent upon the court to give to the jury a definition of the phrase "a premeditated design." It is presumed the jury understand the meaning of a premeditated design. Lovett v. State, 30 Fla. 142, 11 South. Rep. 550. If, however, the court does give to the jury a definition of a premeditated design the definition should be accurate and complete as applicable to the allegations and proofs in the particular case.

A premeditated design may be something more than a mere intent. As used in the statute defining murder in the first degree, the phrase "a premeditated design to effect the death" means a design to effect the death that was thought upon for any length of time, however short a time, before the act which effected the death from the premeditated design. The word "premeditated" has reference to, and is descriptive of, the design that the statute makes an essential element of the crime. A premeditated design to effect the death of a human being is a design to kill a human being, which design was thought upon before the act that unlawfully effected the death. The killer must have thought upon the design to kill during some time however short before the fatal act. The thought upon the design to kill may have been for any length of time considered by the jury from the evidence as being sufficient for the killer, under the circumstances of the particular case, to have had in his mind a premeditated design to kill a human being. There must have been some time however short for

thought, and there must have been thought upon the design to kill before the fatal act. The fatal act may have immediately followed the premeditated design to kill, but it must have been unlawfully committed from the premeditated design to kill. In defining the offense of an unlawful killing of a human being done from a premeditated design to effect the death of the person killed or any human being, the law fixes no particular length of time for the design to be premeditated or thought upon by the killer before the unlawful killing. So long as there was some time for a design to kill a human being to have been premeditated or thought upon by the slayer before the unlawful fatal act, the sufficiency of the time is for the determination of the jury from the facts and circumstances in evidence in each case.

The essentials of a conviction for murder in the first degree charged to have been committed from a premeditated design to effect the death of the person killed or any human being, are that there has been an unlawful killing of a human being by the accused, that the killing was done from a premeditated design to effect the death of the person killed or any human being. This requires that the accused shall have unlawfully killed the human being alleged, that such unlawful killing was done from a design to kill a human being, and that such design was premeditated or thought upon by the accused before the unlawful killing. It is for the jury, under proper charges, to determine solely from the facts and circumstances in evidence, whether there was sufficient time for the accused to have had in his mind a premeditated design to kill a human being before the unlawful killing alleged, and whether the accused had such premeditated design, and whether there was an unlawful killing by the accused of the person alleged, and whether such unlawful killing was done from a premeditated design to kill a human being. The

jury should be instructed as to these essentials in all cases where the allegations and proofs make it proper.

When one paragraph of the general charge of a court to the jury contains a technically incomplete abstract definition of a word or phrase in common use, the meaning of which the jury are presumed to under-. stand, and such technically incomplete abstract definition is so given as not to confuse or mislead the jury, and in other paragraphs of the charge proper instructions applicable to the specific case are given to the jury by the court, and no conflicting or misleading specific instructions are given, the technically incomplete abstract definition is not reversible error. See Davis v. State, decided this term.

In defining premeditated design the trial court in its general charge in effect instructed the jury that premeditation is defined as meaning intent before the act, that design means intent and both words imply premeditation, that the premeditation must be of sufficient duration for forming "a distinct and conscious intent to kill." By this the court evidently meant to charge the jury that premeditation is essential to the intent or design from which murder in the first degree is committed. The definition as given is purely abstract, and taken with the view here suggested, it is, even though technically incomplete, not misleading or confusing to the jury, and when taken in connection with proper specific charges upon the different grades of unlawful homicide applicable to the case, the definition as given would not be reversible error, at least in the absence of conflicting or misleading specific instructions in the case.

The opinion prepared by Mr. Justice PARKHILL is concurred in except as here indicated.

The Chief Justice concurs in this opinion.

COCKRELL, J.—The criticism directed against the charge taken from the opinion of this court in the Ernest case is confined to the idea that it reduces the statutory phrase "premeditated design" to a "mere intent," and that such charge is erroneous irrespective of the nature of the defense.

In the Garner case as in the Cook case this court unanimously held that a man's mind may be so influenced by drink as to render him incapable of premeditation, and in such *exceptional cases* he may "intend" to kill without the reasoning capacity that can rise to the dignity of "premeditation." A general charge is not subject to criticism because it does not provide for every possible exception.

It is objected that the charge eliminates the idea of premeditation and substitutes therefor a "mere" or "simple" intent; it is admitted that design and intent are practically synonymous. A correct analysis of the charge presents to my understanding another meaning; it retains the premeditation required by the statute and does not at all eliminate it.

Had the charge stopped with the clause "Premeditated design to kill means an intent to kill," the criticism might go unchallenged; but it cannot be so isolated. That part of the charge may be said to differentiate to the minds of the jury the crime of murder from accidental killing, and it proceeds at once and in the same sentence to tell them that the "intent to kill" the court is speaking of has within its meaning the idea of premeditation, that is, implies premeditation. The sentence immediately following tells them that in order to find the existence of premeditation that they must find that sufficient time elapsed to enable the slayer to form a *distinct and conscious* intent to kill. Is this eliminating from the statutory crime the idea of pre-

meditation and presenting as a substitute a "mere" or "simple" intent to kill?

While the charge may not be ideal, I do not consider it seriously objectionable. It came originally from the supreme court of Wisconsin which has the identical statutory definition of murder in the first degree and since the decision of the Ernest case in 1883 has been a favorite charge of the circuit judges as an examination, even the most cursory, of the records of this court will show. See Com. v. Tucker, 189 Mass. 457, 76 N. E. 127, 7 L. R. A. (N. S.) 1056.

To say that a general charge to the effect that one who having a distinct and conscious intent to kill does kill, deprives the jury of a due consideration of whether the man of ordinary intelligence and reasoning power must premeditate before forming that *distinct* and *conscious intent* to kill a human being, is to my mind an over-refinement. No distinct and conscious intent to kill a human being can be formed by the average man of ordinary intelligence and perception without some premeditation, and as a general proposition in the domain of mind study, I can see no flaw in it. If the peculiarities of the mentality of the slayer at the time of the homicide call for an exception to this general proposition, it may be given in a separate charge; but this exception does not destroy the general rule.

On the other questions discussed, I concur in the opinion prepared by Judge PARKHILL.